IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LESLIE S. KLINGER, an individual, ) | |
| ) | |
| Plaintiff, ) | Case No.: 1:13-cv-01226 |
| ) | |
| v. ) | Judge: Ruben Castillo |
| ) | |
| CONAN DOYLE ESTATE LTD., a business ) | Magistrate Judge: Sheila |
| entity organized under the laws of the ) | Finnegan |
| United Kingdom, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**DEFENDANT'S RULE 56.1(b)(3) RESPONSE TO
PLAINTIFF'S STATEMENT OF MATERIAL FACTS
AND STATEMENT OF ADDITIONAL MATERIAL FACTS**

Defendant Conan Doyle Estate, Ltd. (Conan Doyle) by and through its undersigned counsel, responds as follows to Plaintiff's Local Rule 56.1(a)(3) Statement of Material Facts In Support of His Motion for Summary Judgment, and states additional material facts as follows.

**I
CONAN DOYLE'S RESPONSES TO
PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

1. Plaintiff Leslie S. Klinger ("Klinger"), a citizen of the United States residing in Malibu, California, is the author and editor of twenty-seven (27) books and dozens of articles on various topics relating to the mystery and thriller genre in literature, including two dozen books and numerous articles on the subject of the so-called Canon of Sherlock Holmes, a phrase that refers to the four (4) novels and fifty-six (56) stories by Sir Arthur Conan Doyle featuring the fictional character of Sherlock Holmes and other related characters and story elements (collectively, "the Canon"). By way of example, Klinger is the author of, among other works, the definitive three-volume collection of canonical Sherlock Holmes books and stores titled *The New Annotated Sherlock Holmes,* which was published by W. W. Norton in 2004 and 2005 and which won the Edgar® Award for Best Critical/Biographical Work. Klinger is widely recognized as one of the world's leading authorities on the Canon and served as the technical advisor for Warner Bros.' two recent Sherlock Holmes films and has consulted with many other authors on a number of scripts, books and comics. Klinger is also an attorney admitted to the practice of law in California and specializes in tax, estate and corporate matters. (Declaration of Leslie S. Klinger ("Klinger Decl."), ¶ 3, Exhibit D; Complaint in U.S.D.C. Case No.1: 13-cv-01226 ("Compl."), Dkt. 1, ¶ 1.)

**RESPONSE**: Conan Doyle does not dispute Plaintiff's citizenship and biographical facts, and agrees that the so-called Canon consists of the four novels and fifty-six stories by Sir Arthur Conan Doyle featuring the literary character Sherlock Holmes and related characters, settings, and story elements. Conan Doyle does deny that Plaintiff is "the author of" "the definitive three-volume collection of canonical Sherlock Holmes books and stores [sic] titled *The New Annotated Sherlock Holmes*." Plaintiff is the editor of that book, as he is of most of the books with which he has been involved, and Conan Doyle denies that the book is the "definitive" edition of the Sherlock Holmes stories. (Affidavit of Jon Lellenberg, Aug. 27, 2013, ¶ 10; Affidavit of Loren Estleman, Sept. 7, 2013, ¶ 13.)

2. Klinger is the co-editor, with Laurie R. King ("King"), of a work titled *A Study in Sherlock*, published in 2011 by Random House and Poisoned Pen Press, which consists of a collection of new and original short stories by prominent contemporary authors, all of which were inspired by the Canon and feature various characters and other story elements from the Canon. (Klinger Decl., ¶ 3; Compl., ¶ 2.)

**RESPONSE**: Conan Doyle agrees with paragraph 2, and further states that the stories in *A Study in Sherlock* used the Holmes and Watson characters as developed in all sixty stories, and also used plot, setting, and story elements from the ten copyrighted stories of the Canon. Among the protected elements used in *A Study in Sherlock* are:

- the Sherlock Holmes literary character, created throughout the Canon fully realized only in post-1922 copyrighted stories;
- the Dr. John H. Watson literary character, created throughout the Canon and fully realized only in post-1922 copyrighted stories;
- the story elements of Sherlock Holmes's retirement from detective practice in London for a new bee-keeping life in the Sussex countryside, depicted in the copyrighted story "The Lion's Mane" (1926);
- the unrecorded case of the Politician, the Lighthouse, and the Trained Cormorant, from "The Veiled Lodger" (1927) and "The Creeping Man" (1923), which many commentators about Sherlock Holmes have paid special attention to;
- Holmes incorporating into his practice electronic apparatus of the 20th and 21st centuries, including the wireless radio ("The Lion's Mane" (1926)), and speaking about "the wonders of electricity," not present in Sir Arthur Conn Doyle's Baker Street until the copyrighted stories "Illustrious Client" (1924), "Three Garridebs" (1924), and "Retired Colourman" (1926);
- Simpson's, the London restaurant where Holmes and Watson dine in "The Illustrious Client" (1924);
- a plot that relies upon Dr. Watson's second marriage and medical practice from the copyrighted story "The Blanched Soldier" (1926), and refers to the copyrighted "Sussex Vampire" (1924).

(See Lellenberg Aff., ¶ 10; Affidavit of H. George Fletcher, Sept. 9. 2013, ¶ 9)

3. Klinger and King are also the co-editors of a sequel to *A Study in Sherlock*, currently titled *In the Company of Sherlock Holmes*, which is another collection of new and original short stories

2

by contemporary authors, all of which were inspired by the Canon and feature various characters and story elements from the Canon. *In the Company of Sherlock Holmes* is currently being prepared by Klinger and King for publication by Pegasus Books and distribution by W. W. Norton but has not yet been published. (Klinger Decl., ¶ 3; Compl., ¶ 3.)

**RESPONSE**: Conan Doyle does not dispute that Plaintiff is presently co-editing another short-story collection making use of Sherlock Holmes, Dr. Watson and other characters, settings, and story elements from the Canon.

4. Defendant Conan Doyle Estate Ltd. ("Defendant") is a company registered under the laws of the United Kingdom and owned by members of the Arthur Conan Doyle family, having a primary place of business at 9 London Road, Southampton, United Kingdom. (Klinger Decl., ¶ 5; Compl., ¶ 4.)

**RESPONSE**: Conan Doyle agrees with paragraph 4.

5. Defendant is actively engaged in offering to license, and licensing its purported rights in the Canon, including purported rights under copyright, to third parties in this District and throughout the United States by and through the Defendant's exclusive authorized licensing agents in the United States, the firm of Hazelbaker & Lellenberg, and its principal, Jon Lellenberg (collectively, "Defendant's Agent"), whose primary place of business is located at 1501 Hinman Avenue, No. 8B, Evanston, Illinois. (Klinger Decl., ¶ 6; Compl., ¶ 5.)

**RESPONSE**: Conan Doyle agrees that it offers to and does license its intellectual property, including copyrights, in the works of Sir Arthur Conan Doyle, but disagrees with the characterization of those widely acknowledged rights as mere "purported rights." (Lellenberg Aff., ¶ 10.)

6. Plaintiff has raised claims arising under the Copyright Act, *17 U.S.C. §§ 101 et seq.* and the Constitution of the United States. This Court has jurisdiction over such claims pursuant to *28 U.S.C. §1331 and 1338*. (Compl., ¶ 3.)

**RESPONSE**: Conan Doyle has intellectual property rights other than copyrights, including trademark rights and rights under contract law and principles of unfair competition. Conan Doyle does not dispute the jurisdiction of this Court over cases with an actual controversy arising under the Copyright Act, but asserts that Plaintiff has failed to establish a case or controversy. (Lellenberg Aff., ¶ 10.)

7. Venue is proper in this District pursuant to *28 U.S.C. § 1391* because the principal place of business for the licensing agent who represents Defendant Conan Doyle Estate, Ltd. ("Defendant") in the United States and several of the material alleged events giving rise to the Plaintiff's complaint occurred within this judicial district, and because a substantial part of the harm threatened to Plaintiff is occurring in this District. (Klinger Decl., ¶ 5; Compl., ¶ 7, ¶ 8 and; Compl., ¶ 35-¶ 37.)

**RESPONSE**: Conan Doyle does not dispute the venue of this Court, but disputes that any harm has been threatened to Plaintiff by Conan Doyle asserting its legitimate United States copyrights and other intellectual property rights. (Lellenberg Aff., ¶ 10.)

8. The fictional characters of the detective Sherlock Holmes, his friend and colleague John H. Watson ("Dr. Watson"), and other characters and story elements relating to Sherlock Holmes first appeared in a story titled *A Study in Scarlet* by Sir Arthur Conan Doyle ("Conan Doyle"), which was first published in the *Beeton's Christmas Annual* in 1887 and first published in the United States in 1890. (Declaration of Peter Blau ("Blau Decl."), ¶ 6, Exhibit E; Declaration of Steven Rothman ("Rothman Decl."), ¶ 6, Exhibit F; Klinger Decl., ¶ 4; Compl., ¶¶ 9–12.)

**RESPONSE**: Conan Doyle agrees that Sir Arthur Conan Doyle introduced the characters Sherlock Holmes and Dr. Watson in *A Study in Scarlet* in 1887, first published in the United States in 1890. The characters of Holmes and Watson were not fully created or disclosed, however, in *A Study in Scarlet*. Sir Arthur continued to create Holmes's and Watson's characters throughout the Canon, and completed the development and realization of both characters in his last stories published in 1923 and after. Paragraph 6 in Conan Doyle's Statement of Additional Material Facts below lists dimensions and aspects of Holmes's character and of Watson's character created in copyrighted stories. Plaintiff's own list of "Sherlock Holmes Story Elements" lists at least two aspects of Watson's character that Plaintiff admits occurred in copyrighted stories—Watson's second marriage and background as an athlete. (Compl., Ex. A, at 2; Lellenberg Aff., ¶ 10; Estleman Aff., ¶ 13.)

9. Conan Doyle continued to write and publish a total of four (4) novels and fifty-six (56) stories featuring Sherlock Holmes, Dr. Watson and other story elements relating to Sherlock Holmes between 1887 and 1927. (Blau Decl., ¶ 6; Rothman Decl., ¶ 6; Klinger Decl., ¶ 4; Compl., ¶¶ 15–16.).

**RESPONSE**: Conan Doyle agrees with paragraph 9.

10. The various specific characters, character traits, dialogue, settings, artifacts, story lines and other story elements set forth in the attached Exhibit "A" (collectively "the Sherlock Holmes Story Elements"), which Exhibit "A" is incorporated by reference herein, were first introduced by Conan Doyle in the various specific novels and stories set forth in Exhibit "A." (Blau Decl., ¶ 6; Rothman Decl., ¶ 6; Klinger Decl., ¶ 4; Compl., ¶ 11.)

**RESPONSE**: Conan Doyle agrees that the dialogue, settings, artifacts, character traits, story lines and other story elements in Ex. A were first introduced in the named novels and stories, some of which Plaintiff admits are copyrighted. But the list of Sherlock Holmes character traits in Plaintiff's Ex. A is not a complete description of Sherlock Holmes's character. Also, to accurately describe Holmes's and Watson's characters requires using copyrighted material from Sir Arthur's post-1922 stories. Plaintiff himself admits this in his Ex. A by listing at least two dimensions of Watson's character from copyrighted stories, as set forth in response to ¶ 8 above—though Plaintiff does not describe the full import of these for Watson's character development. (See Conan Doyle's Statement of Additional Material Facts, ¶ 6(j)-(k).)

The Sherlock Holmes character as created by Sir Arthur over the sixty stories of the Canon is a single developing character, one work of authorship. There are not sixty versions of Holmes's character in the sixty stories; there is one complex Sherlock Holmes. Using Holmes's character uses integrated dimensions and aspects of the character protected by copyright. The threads of a complex literary character can no more be unraveled than a human person's character can be unraveled without disintegrating and distorting that character. This is particularly true here, because

4

Sir Arthur did not develop Holmes's and Watson's character in a strictly chronological way. All of the last ten copyrighted stories are set at various points earlier in the two men's fictional lives, and develop aspects of their character and background as younger men. This makes it impossible to split Holmes and Watson's characters into partial and full versions, or to conclude that the characters are in the public domain up to a certain point in their fictional lives. At any given point in their fictional lives the characters depend on character development in the copyrighted stories. Attempts to portray less than the full character Sir Arthur created, even if that were possible, would misrepresent his work to the world. (Lellenberg Aff., ¶ 10; Estleman Aff., ¶ 13; Fletcher Aff., ¶ 9; Woiwode Aff., ¶ 17; Sayers Aff., ¶ 6.)

11. Of the various novels and stories that constitute the Canon, all of the novels and all but ten (10) of the stories were first published in the United States on various dates prior to January 1, 1923. (Blau Decl., ¶ 6; Rothman Decl., ¶ 6; Klinger Decl., ¶ 4; Compl., ¶ 18-¶ 21.)

**RESPONSE**: Conan Doyle agrees with paragraph 11.

12. The ten (10) stories that were first published in the United States after January 1, 1923, and their respective dates of first publication in the United States, are set forth in the attached Exhibit "B," which is incorporated by reference herein (collectively "the Ten Stories"). (Blau Decl., ¶ 6; Rothman Decl., ¶ 6; Klinger Decl., ¶ 4; Compl., ¶ 21.)

**RESPONSE**: Conan Doyle agrees with paragraph 12.

13. The forty-six (46) stories and four (4) novels that were first published in the United States prior to January 1, 1923 are set forth in the attached Exhibit C, which is incorporated by reference herein. (Blau Decl., ¶ 6; Rothman Decl., ¶ 6; Klinger Decl., ¶ 4; Compl., ¶ 14-¶ 16.)

**RESPONSE:** Conan Doyle agrees with paragraph 13.

14. The forty-six (46) stories and four (4) novels set forth in the attached Exhibit C, and the contents thereof in their entirety, are now in the public domain in the United States by reason of the fact that each of them was first published in the United States prior to January 1, 1923. (Blau Decl., ¶ 6; Rothman Decl., ¶ 6; Klinger Decl., ¶ 4; Compl., ¶ 21.)

**RESPONSE:** Conan Doyle agrees that the fifty stories and novels published in the United States before 1923 are now in the public domain. However, at the end of the fiftieth story the characters of Sherlock Holmes and Dr. Watson were still in the process of creation by their author. Because a literary character is an integrated work of authorship that cannot be dismembered into a "public domain version" and a "complete version," the character does not enter the public domain until the materials creating the character enter the public domain. Holmes and Watson's characters continued to be created by their author in the ten stories Plaintiff admits are copyrighted. The characters therefore cannot be in the public domain. (Lellenberg Aff., ¶ 10; Estleman Aff., ¶ 13; Fletcher Aff., ¶ 9; Woiwode Aff., ¶¶ 9, 11, 17; Sayers Aff., ¶ 6.)

15. Only the Ten Stories remain under copyright in the United States as of the date of this Rule 56.1(a)(3) Statement. (Blau Decl., ¶ 6; Rothman Decl., ¶ 6; Klinger Decl., ¶ 4; Compl., ¶ 22-¶ 23.)

**RESPONSE:** Conan Doyle agrees with paragraph 15. The ten copyrighted stories constitute one-sixth of the novels and stories of the Canon. (Lellenberg Aff., ¶ 10.)

16. All of the Sherlock Holmes Story Elements first appeared in novels and stories that were first published in the United States prior to January 1, 1923, and for that reason, all of the Sherlock Holmes Story Elements are now in the public domain in the United States. (Blau Decl., ¶ 7; Rothman Decl., ¶ 7; Klinger Decl., ¶ 4; Compl., ¶ 11-¶ 18.)

**RESPONSE:** This is false. Two of the elements in Plaintiff's list of "Sherlock Holmes Story Elements" were created in copyrighted stories by Plaintiff's own admission. On page 2 of his "Sherlock Holmes Story Elements," Plaintiff lists elements of Watson's character, and two of his seven elements come from stories Plaintiff admits are copyrighted: Watson's second marriage (Ex. A acknowledges that this "is only mentioned in copyrighted stories 'The Illustrious Client' and 'The Blanched Soldier'"), and Watson's background as a former athlete (created in the copyrighted 1924 story "The Sussex Vampire"). (Compl., Ex. A, at 2.) Although Plaintiff admits these aspects of Watson's character development come from copyrighted stories, Plaintiff does not acknowledge their significance in developing Watson's character and the relationship between Holmes and Watson. (See Conan Doyle's Statement of Additional Material Facts, ¶ 6(j)-(k).)

In addition, Plaintiff's "Sherlock Holmes Story Elements" noticeably omits "the character of Sherlock Holmes" and "the character of Dr. Watson," both created by continuous development throughout the Canon and not fully realized or revealed until the last copyrighted stories. Plaintiff's "Sherlock Holmes Story Elements" are only partial renderings of Holmes and Watson's character and do not describe the characters as Sir Arthur created them and as they are recognized by audiences around the world—as described more fully in the response to ¶¶ 8, 10, and 14 above and ¶ 6 of Conan Doyle's Statement of Additional Material Facts below. (Lellenberg Aff., ¶ 10; Estleman Aff., ¶ 13; Fletcher Aff., ¶ 9.)

17. None of the Sherlock Holmes Story Elements first appeared in any of the Ten Stories and, for that reason, none of the Sherlock Holmes Story Elements are subject to copyright protection by reason of the copyright status of the Ten Stories in the United States. (Blau Decl., ¶ 8; Rothman Decl., ¶ 8; Klinger Decl., ¶ 4; Compl., ¶ 20-¶ 23.)

**RESPONSE:** This is again false by Plainitff's own admission, as described in response to ¶ 16 above. In addition, the characters of Sherlock Holmes and Dr. Watson, left off the "Story Elements" list, changed, developed, and matured into completion in the ten copyrighted stories, and are thus protected by the copyrights in those ten stories. (Lellenberg Aff., ¶ 10; Estleman Aff., ¶ 13; Fletcher Aff., ¶ 9.)

18. Defendant holds itself out as the exclusive owner of all rights under copyright in the United States in and to the Canon. Specifically, Defendant takes the position that its permission is required to create and exploit any and all derivative works based on any element of the Canon, including not only the Ten Stories but also any of the Sherlock Holmes Story Elements, all of which first appeared in stories and novels that are now in the public domain. (Klinger Decl., ¶ 3; Compl., ¶ 5 and ¶ 17.)

**RESPONSE:** Conan Doyle agrees that it is the exclusive owner of all copyrights and other intellectual property rights in the United States in and to the works of Sir Arthur Conan Doyle.

6

Conan Doyle does not take the position that any derivative work based on any element of the Canon requires a license. Conan Doyle does take the position that use of the Sherlock Holmes and Dr. Watson characters in new stories requires a license, because such use involves the integrated Holmes and Watson characters created throughout all sixty stories of the Canon, including character development that occurred in post-1922 copyrighted stories. (Lellenberg Aff., ¶ 10.)

19. Defendant is actively engaged in offering and granting licenses of its purported rights in the Canon and the Sherlock Holmes Story Elements to third parties through Defendant's Agent. (Klinger Decl., ¶ 3; Compl., ¶ 17.)

**RESPONSE:** Conan Doyle offers and grants licenses to its rights through its United States agent, Hazelbaker & Lellenberg and its principal Jon Lellenberg. (Lellenberg Aff., ¶ 10.)

20. Defendant, by and through Defendant's Agent, threatens to interfere with the creation and/or exploitation of derivative works embodying any of the Sherlock Holmes Story Elements, including but not limited to derivative works in the nature of books and stories, unless the authors and/or publishers of such books and stories first obtain and pay for a license from Defendant. (Klinger Decl., ¶ 3 and Comp., ¶ 31.)

**RESPONSE:** Conan Doyle agrees that where appropriate it asserts its copyrights and other intellectual property rights against parties who threaten to infringe those rights and exploit Conan Doyle's intellectual property without permission, but Conan Doyle disputes that its actions in defending its property rights constitute threats to interfere with anyone's rights. (Lellenberg Aff., ¶ 10.)

21. Defendant has expressly threatened to interfere with the publication of new and original stories in an anthology compiled and edited by Plaintiff and Plaintiff's co-editor, Laurie R. King, unless Plaintiff or his publisher first obtains and pays for a license from Defendant. (Klinger Decl., ¶ 3; Compl., ¶ 24-34.)

**RESPONSE:** Conan Doyle disagrees with Plaintiff's characterizations that Conan Doyle "threatened to interfere" with Plaintiff's short-story collection *A Study in Sherlock* and his collection currently in progress. Conan Doyle informed Plaintiff's publisher, Random House, of the need for a license for *A Study in Sherlock* because of its proposed use of the Sherlock Holmes and Dr. Watson character rights. Plaintiff contended that no license was necessary, but Random House disagreed and entered into a license agreement with Conan Doyle. Although Plaintiff has not allowed Conan Doyle to review his current collection and has not submitted it to the Court for review, Plaintiff does admit that the book uses the Holmes and Watson characters. In addition, Conan Doyle has been informed that the new book will also use other characters and elements from the last ten copyrighted stories, as more fully described below in Conan Doyle's Statement of Additional Material Facts, ¶ 23. (Lellenberg Aff., ¶ 10.)

22. Contrary to its assertions, Defendant enjoys no right to control how the Sherlock Holmes Story Elements are used by Plaintiff or any other person in the United States by reason of the following facts:

7

   (a) All of the novels and stories comprising the Canon, with the sole exception of the Ten Stories, are now in the public domain under copyright law in the United States. (Blau Decl., ¶ 6; Rothman Decl., ¶ 6; Klinger Decl., ¶ 4; Compl., ¶ 21 and ¶ 23.)

   (b) Each and every one of the Sherlock Holmes Story Elements appeared for the first time in novels and stories that were published prior to January 1, 1923, and thus the Sherlock Holmes Story Elements, as well as the novels and stories in which they first appeared, are now in the public domain under copyright law in the United States. (Klinger Decl., ¶ 4; Compl., ¶ 21¬¶ 23.)

   (c) None of the Sherlock Holmes Story Elements appeared for the first time in the Ten Stories, and thus the copyright status of the Ten Stories does not extend copyright protection in the United States to any of the Sherlock Holmes Story Elements. (Klinger Decl., ¶ 4; Compl., ¶ 21-¶ 23.)

   (d) For the reasons stated above, no license or other consent or permission of any kind whatsoever is required under U.S. copyright law for Plaintiff or any other person whatsoever to create and exploit derivative works, including but not limited to novels and stories, based on the Sherlock Holmes Story Elements and/or any other contents of the novels and stories set forth in the attached Exhibit C. (Klinger Decl., ¶ 4; Compl., ¶¶ 21–23.)

**RESPONSE**: This is false by Plaintiff's admission, as set out in response to ¶ 16 above. While Conan Doyle agrees that the first fifty Sherlockian novels and stories by Sir Arthur are in the public domain, the Holmes and Watson literary characters continued to be created by their author in the ten stories Plaintiff admits are still protected by copyright. (See Conan Doyle's Statement of Additional Material Facts, ¶ 6 below.)

Plaintiff's "Sherlock Holmes Story Elements" are incomplete renderings of Holmes and Watson's character and do not describe the characters Sir Arthur created, as set out more fully in response to paragraphs 8, 10, 14, and 16 above and paragraph 6 of Conan Doyle's Additional Material Facts below. A literary character is a single work of authorship that can no more be dismantled than a single novel can be dismantled into public domain and protected chapters. A literary character cannot enter the public domain until the works creating that character enter the public domain, which in Holmes's case occurs at the end of 2022. (Compl., Ex. B; Lellenberg Aff., ¶ 10; Estleman Aff., ¶ 13; Fletcher Aff., ¶ 9; Woiwode Aff., ¶¶ 9, 12, 14, 17; Sayers Aff., ¶¶ 6,7, 12.)

  23. An actual case and controversy exists as between Plaintiff and Defendant in that Plaintiff asserts, and Defendant denies, the right of Plaintiff and any other person to create and exploit new derivative works based on the Sherlock Holmes Story Elements as embodied in the novels and stories in the Canon that are now in the public domain, and Defendant has actively attempted to prevent Plaintiff from doing so by interfering with its efforts to publish such new derivative works. (Klinger Decl., ¶ 3; Compl., ¶¶ 39–41.)

**RESPONSE**: Conan Doyle disputes that a case or controversy exists, and disputes that the alleged controversy over Plaintiff's proposed new book can be resolved in the present motion for two reasons. First, Plaintiff seeks a judgment that his new book does not infringe Conan Doyle's copyrights in the last ten stories of the Canon, but Plaintiff has refused to submit his proposed book for the parties' review or for the Court to determine that issue. Second, Plaintiff's effort to have his proposed new book declared non-infringing should be denied because Plaintiff admits that the book

8

uses the Holmes and Watson characters, but the creation of those literary characters continued and was completed in the ten stories Plaintiff admits are copyrighted. The characters are thus copyrighted until the last ten stories enter the public domain in 2022. (Lellenberg Aff., ¶ 10; Estleman Aff., ¶ 13; Fletcher Aff., ¶ 9.)

24. Plaintiff has incurred actual legal fees and expenses in the total amount of $17,272.25 through the date of signing of this Rule 56.1(a)(3) Statement and will incur additional expenses through the date of entry of final judgment on the merits, which Plaintiff will report to the Court. (Klinger Decl., ¶ 3.)

**RESPONSE:** Conan Doyle disputes the reasonableness and recoverability of Plaintiff's attorneys' fees, but that issue should be reserved for the conclusion of the case when the prevailing party is known. Conan Doyle has incurred attorneys' fees to date in an amount to be proven if Conan Doyle is the prevailing party.

## II
## CONAN DOYLE'S STATEMENT
## OF ADDITIONAL MATERIAL FACTS

1. Conan Doyle is a company owned by members of the family of Sir Arthur Conan Doyle. Conan Doyle's directors are Richard Doyle and Catherine Doyle Beggs, whose grandfather was Sir Arthur's brother Innes, and Richard Pooley, stepson of Sir Arthur's daughter Dame Jean Conan Doyle. (Lellenberg Aff., ¶ 11.)

**A. Both Holmes and Watson's Characters Are Continuously Created Throughout the Canon**

2. Sherlock Holmes is perhaps the most famous character in modern literature. Part of the reason for his success and that of Dr. Watson is that while they are distinct and compelling from their first appearance, like real people they continue to develop and change throughout their fictional lives. In fact, the first two Sherlock Holmes novels, *A Study in Scarlet* and *The Sign of the Four*, made little impression upon the reading public; it was only after the characters were further developed in new short stories that the characters started to become widely recognized and followed. Holmes and Watson are not flat cartoon characters who simply go through a variety of scenarios. They are complex, constantly developing literary characters who continued to be revealed, to change, and to become more fully realized throughout all of Sir Arthur's stories about them. Their interests, likes

9

and dislikes, attitudes, habits of mind, and personalities were created continuously, but not in a linear fashion, by Sir Arthur over sixty stories, taking Holmes and Watson from young men in their twenties into their early sixties. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

3. The Holmes and Watson characters are each single works of authorship created throughout the Canon. Holmes's character was not complete with the first story, with 59 subsequent derivative variations as each successive story or novel was released. Holmes is a single individual who developed and changed in an organic way like a human person. Both his and Watson's arc as characters exist complete only in the entire Canon; no single published work or subset of the Canon can be considered derivative of any other subset. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

4. Sir Arthur did not develop Holmes's character in a strictly chronological way as the stories progressed. All of the last ten copyrighted stories are set in various points earlier in Holmes's life and reveal aspects of his character and background as a younger man. For this reason also it is not possible to split Holmes or Watson's characters into partial and full versions, or conclude that the characters are in the public domain up to a certain point in their fictional lives. It is also impossible for Plaintiff to take the Holmes or Watson characters at any given point in their fictional lives without invading character development created in the last ten copyrighted stories. Use of the characters as they existed at any particular time in their lives necessarily uses character development from copyrighted stories. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

5. For instance, "The Blanched Soldier" (1926) and "The Lion's Mane" (1926) are both set earlier in Holmes's career than stories previously written by Sir Arthur, but after Holmes and Watson parted ways in stories set in the fictional 1903. The remainder of the copyrighted *Case-Book* stories temporally are scattered among the earlier stories and their time-settings. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

6. The following are examples of dimensions and elements of Holmes's and Watson's characters created in post-1922 copyrighted stories:

> a. Holmes softened and became more emotional over time, finally convincing himself in the copyrighted 1926 story "The Lion's Mane" that he needed "the soothing life of Nature." This dimension of Holmes's character is also developed in the copyrighted 1924 story "The Three Garridebs." When the story's villain fires a gun at Holmes and Watson, wounding Watson, Holmes says:
>
>> "You're not hurt, Watson? For God's sake, say that you are not hurt!"
>>
>> It was worth a wound—it was worth many wounds—to know the depth of loyalty and love which lay behind that cold mask. The clear, hard eyes were dimmed for a moment, and the firm lips were shaking. For the one and only time I caught a glimpse of a great heart as well as a great brain. All my years of humble but single-minded service culminated in that moment of revelation.
>
> This scene is of critical importance in understanding the two characters, the way Holmes changed, and the nature of his relationship with Watson over the years of their association, as discussed more fully next. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)
>
> b. Holmes's and Watson's relationship changes over the years, developing in the copyrighted stories into a truly close friendship. This maturing relationship cannot be quantified in a precise way in Holmes's character; it is a naturally changing dimension of his character shown in two copyrighted stories set at different points in Holmes's career:
>
> In the 1926 story "The Blanched Soldier," Holmes must narrate the case himself because Watson is no longer his collaborator: Watson has remarried, moved out of Baker Street, and renewed his career as a doctor elsewhere. "Blanched Soldier" shows an earlier development in Holmes's and Watson's relationship, when Holmes calls Watson's remarriage "the only selfish action which I can recall in our association. I was alone."
>
> "The Three Garridebs" (1924), on the other hand, quoted above, reveals the pinnacle of Holmes's and Watson's friendship in a copyrighted story. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)
>
> Plaintiff Klinger himself has written of this progressive character development revealed in copyrighted stories. In his *New Annotated Sherlock Holmes* (W.W. Norton 2004) (hereafter *NASH*), published under license from Conan Doyle, Plaintiff writes of "The Three Garridebs": "Holmes expresses a moving concern for Watson's safety. Perhaps as a sign of Holmes's age (48) or his impending retirement in 1904 [sic], Holmes's and Watson's relationship has grown from that of mere flat-mates in 1881 to the closest of friendships." (*NASH* at 1581.)

11

Plaintiff also admits that Holmes's relationship with Watson is further developed in the copyrighted story "The Retired Colourman" (1926), as "Watson seems pleased to recollect his active partnership with Holmes." (*NASH* at 1730.) The story also introduces "Holmes's 'hated rival on the Surrey shore' (of whom we have heard nothing before)." (*Id.*) (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

c. Holmes grows from someone who cares little for dogs to someone with such great interest in them and their relationship to humans that, in the copyrighted story "The Creeping Man" (1923), Holmes intends to write a monograph on the subject. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

Plaintiff writes of this copyrighted story: "Holmes's attitude toward dogs has changed markedly from his cold (but not cruel) dog poisoning in *A Study In Scarlet*. Now Holmes sees dogs as the mirror of their household, and he even plans a monograph on the topic." (*NASH* at 1636.)

d. Holmes's character takes on a darker cast in the last collection of stories—and this too became part of who Sherlock Holmes is. He became less racially tolerant in a 1926 copyrighted story, for example. Plaintiff Klinger writes about this development in "The Three Gables" (1926): "Holmes's sarcastic remarks to Steve Dixie, certainly racist by modern standards, display an attitude markedly different from his evident racial tolerance on view in "The Yellow Face," an 1893 story." (*NASH* at 1534.) (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

e. It becomes clear from 1926 copyrighted story "The Blanched Soldier" that Holmes has acquired over time a knowledge of medicine, whereas previously he relied on Dr. Watson, absent from this story, for such guidance. Plaintiff writes of this story that it "demonstrates Holmes's knowledge of medicine rather than his detective skills," a new development in the character of Sherlock Holmes. (*NASH* at 1482.) (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

f. The copyrighted stories "The Sussex Vampire" (1924), "The Illustrious Client" (1924), and "The Creeping Man" (1923) reveal for the first time that Holmes has converted his practice into an "Agency" after Dr. Watson moved out of Baker Street. Holmes's Agency employs various informants and a "general utility man" named Mercer "who looks up routine business" for the Agency. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10; *NASH* at 1449, 1555, 1636.)

g. Holmes embraces modern technologies for the first time in copyrighted stories, revealing that he kept current with technological change and adopted it in his practice. Sir Arthur introduced telephones at 221B Baker Street in "Illustrious Client" (1924), "Three Garridebs" (1924)*,* and "Retired Colourman" (1926), along with telephone directories in two of these stories. In another copyrighted story, "Shoscombe Old Place" (1927), Holmes pioneers "the use of the microscope as an investigative tool," in Plaintiff's words, and in "The Lion's Mane" (1926), Holmes employs photographic analysis for detection, which Plaintiff concedes was "not

12

previously mentioned among the various techniques Holmes employs throughout the Canon." The same copyrighted story brings Holmes into contact with the "wireless" radio, another piece of technology that did not exist for some decades when the Sherlock Holmes stories were new. (*NASH* at 1449, 1581, 1730, 1707, 1667; Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

h. In "The Sussex Vampire" (1924), we first find out about "Holmes's great index," a reference tool of his own invention with references also to such unrecorded cases of his as Victor Lynch, the forger; the giant rat of Sumatra, "a story for which the world is not yet prepared"; Vanderbilt and the Yeggman; Vittoria the Circus Belle; and Vigor, the Hammersmith Wonder." Each of these were mentioned in the copyrighted "Sussex Vampire" story with details noted in "Holmes's great index," compiled over many years but revealed for the first time in this 1924 *Case-Book* story. (*NASH* at 1555.) (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

i. Holmes's famous retirement is depicted only in the 1924 copyrighted story "The Lion's Mane." From this story we learn that Holmes has given up his detective Agency, is no longer living in London, and has moved to the South Downs of Sussex, where he lives quietly keeping bees and writing about nature subjects. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

Plaintiff admits that this copyrighted story "is the Canon's only depiction of Holmes's retirement. July 1907 sees Holmes in residence in Sussex, and the story gives many clues as to the location of Holmes's last known home (where readers long to believe he still lives). Maud Bellamy, whose fiancée is the victim of the alleged crime, is a singularly attractive figure, and some suggest that Holmes had 'feelings' for her, something at great variance with Sherlock Holmes's earlier notorious misogyny about which Dr. Watson remarked repeatedly in earlier stories." (*NASH* at 1667.)

j. Watson's character is also created and developed in copyrighted stories—and Plaintiff's own Ex. A list of character traits acknowledges this. Two out of the seven Watson character traits Plaintiff lists in his Ex. A are from admittedly copyrighted stories. First, Watson's second marriage and departure from the Baker Street flat comes from two copyrighted stories, "The Illustrious Client" (1924) and "The Blanched Soldier" (1926), as Plaintiff acknowledges. (Compl., Ex. A, at 2.)

What Plaintiff does not acknowledge is the significance of this development in developing Watson's character and altering his relationship with Holmes. As a result of Watson's second marriage and move, Holmes instead of Watson is required to narrate two cases, one prior to his retirement from active practice ("The Blanched Soldier," 1926), and the other well into Holmes's Retirement, "The Lion's Mane" (1926). The implications of Watson's second marriage are significant for his character and background, including even leading some scholars to surmise Watson married not only twice but as many as five times, starting before he and Holmes ever met. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

13

    k. Second, Watson's background as a former athlete is revealed only in the copyrighted 1924 story "The Sussex Vampire," reflecting new light back onto his character in his younger years. Again, Plaintiff's own description of Watson's supposedly public domain character admits that this dimension of Watson's character is created in a copyrighted story. (Compl., Ex. A, at 2.)

    Plaintiff writes elsewhere about "Sussex Vampire" (1924) that it contains the only "[r]eferences to Watson's youth, when he played rugby for Blackheath." (*NASH*, at 1555; Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

    l. The 1927 story "Shoscombe Old Place" also reveals that among Dr. Watson's habits is a serious over-fondness for horse-racing, which he pays for with "half my wound pension." This is the last Holmes story Sir Arthur wrote, but like all the *Case-Book* stories, it is set earlier in Watson's life. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

These are broad outlines of developments in Holmes and Watson's characters in the Ten Stories. A great many finer details of character development can be identified as one reaches greater levels of specificity in the copyrighted Ten Stories. In addition, the foregoing list is not intended to identify all protected material in the Ten Stories; it makes no effort to identify copyrighted dialogue, settings, plots, new characters, or other story elements in the Ten Stories beyond Holmes and Watson's characters. (Lellenberg Aff., ¶ 11.)

**B. Holmes Is Different From Cartoon or Flat Characters but in the Company of a Great Many Significant Literary Characters in Modern Fiction**

    7. While the author of the Holmes and Watson characters continued to create their characters throughout his series of stories about them, the same is often not true of flat or cartoon characters in a series. A cartoon character is generally complete in the first—or perhaps first few—stories about him or her. A cartoon character is then put into new scenarios without the character itself continuing to develop or take on further dimension. The Harper Handbook of Literature defines a flat character as "a character that is two-dimensional, without the depth and complexity of a living person; the opposite of a round character" (195). The characters Amos and Andy from the eponymous series of radio plays are a classic example of "flat characters;" they never change—

14

merely find themselves in different situations that bring about changes in dialogue, not character. Readers look to many works of popular entertainment for reassurance that the world works exactly as they think it does. It is crucial in such flat works that characters do not alter dramatically. In literary fiction, by contrast, characters continue to develop, frequently upsetting or surprising a reader's expectations. (Woiwode Aff., ¶¶ 9, 10; Sayers Aff., ¶¶ 5-7.)

8. A serious literary character continues to be formed and takes on further attributes and dimensions through every story about that character. In addition to Sherlock Holmes, many other significant literary characters have been developed by their authors over a series of works, including iconic fictional characters in works by William Faulkner, Philip Roth, John Updike, John Cheever, Larry Woiwode, Valerie Sayers, P.D. James, and Loren Estleman. The creation of a substantial character throughout multiple works is a reality of some of the world's great literature going back at least to Sophocles's *Oedipus* trilogy. If a rule were imposed that a character in a series is completely created in the first work in that series, such a rule would fit the creation of cartoon characters and of many flat characters in entertainment series, in which the characters are complete in the first work and simply go through varying scenarios and dialogue. But such a rule would do violence to the creation of dimensional literary characters over a series of works in which authors continue to develop, expand, mature, and change the characters until the end. Such a rule applied to literary characters without looking to see where the actual development of the character ends would dismantle characters into fragments that their authors did not create. (Woiwode Aff., ¶¶ 6–17; Sayers Aff., ¶¶ 5–11.)

9. To say that a character is fully created in one book when the author has continued that character's creation in later books is equivalent to saying that a character in a novel is complete in the first chapter, or that a fully-developed person is present at birth. Such statements are at odds with reality if an author created the character over a series of chapters or books—just as most

15

people continue to change and be forged as they move through life. (Woiwode Aff., ¶ 9; Sayers Aff., ¶ 6; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

10.     Moreover, even when a literary character is created by an author in a series of chapters, stories, or books, that character is a single creation. The various stories and books about him do not contain so many "derivative" or "variant" versions of the character. A literary character is not divisible, though it has many dimensions—like any other person's character. To attempt to dismantle a literary character like Sherlock Holmes is not only impossible as a practical matter, but would ignore the reality that Sir Arthur Conan Doyle created a single complex Sherlock Holmes complete in sixty stories. (Woiwode Aff., ¶¶ 12, 17; Sayers Aff., ¶ 6, 12; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

C.    **Plaintiff's *Study in Sherlock* Made Use of Copyrighted Story Elements Beyond the Holmes and Watson Characters**

11.    *A Study in Sherlock*, the short story collection Plaintiff co-edited in 2011, was published under license from Conan Doyle, although Plaintiff contended then and contends now that his book used only the portion of Sherlock Holmes's character from public domain stories. In fact, at least four of the sixteen stories in *A Study in Sherlock* used clear story elements from copyrighted *Case-Book* stories:

• "You'd Better Go in Disguise," by Alan Brady, refers to wireless radio, to alienist psychology and Sigmund Freud, elements from the *Case-Book* stories "Creeping Man" (1923), "Sussex Vampire" (1924), and "Lion's Mane" (1926), and to Simpson's, the actual London restaurant where Holmes and Watson dine in "Illustrious Client" (1924).

• "As to an 'Exact Knowledge of London,'" by Tony Broadbent, has Holmes and Watson using electronic apparatus of the 20th and 21st centuries, including the wireless radio ("Illustrious Client", 1924), and uses Holmes's new life as a bee-keeper ("The Lion's Mane" (1926)), which Plaintiff in *The New Annotated Sherlock Holmes* calls "the Canon's only depiction of Holmes's retirement," as well as the unrecorded case of the Politician, the Lighthouse, and the Trained Cormorant from "The Veiled Lodger" (1927).

• "The Startling Events in the Electrified City" by Thomas Perry has Holmes speaking about "the wonders of electricity," not present in Baker Street until the *Case-Book* stories "Illustrious Client" (1924), "Three Garridebs" (1924), and "Retired Colourman" (1926) in a

16

plot that relies upon Dr. Watson's second marriage and new medical practice from "Blanched Soldier" (1926). The story concludes with an explicit reference to the *Case-Book* story "Sussex Vampire" (1924).

• "The Case of Death and Honey" by Neil Gaiman dives deep into Sherlock Holmes's Sussex bee-keeping life described in "The Lion's Mane" (1926), as Plaintiff points out himself in an editorial afterword to the story, and also refers to another copyrighted *Case-Book* story, "The Creeping Man" (1923).

(Lellenberg Aff., ¶ 11.)

### D. What Is Known of Plaintiff's Second Short Story Collection Also Clearly Invades Copyrighted Stories

12. Plaintiff has begun co-editing a new short-story collection tentatively entitled *In the Company of Sherlock Holmes* as alleged in his Complaint at ¶¶ 3, 27–34. Conan Doyle learned of the proposed new book when one of the writers invited to contribute to it, the literary historian and critic Michael Dirda, informed Conan Doyle that he intended to use Sir Arthur's fictional character Langdale Pike, originating in the copyrighted 1926 *Case-Book* story "The Three Gables," in his story for Plaintiff's new book. (Lellenberg Aff., ¶ 11.)

SUTIN THAYER & BROWNE
A Professional Corporation


By_____
       Benjamin Allison
       Tracy Hofmann
       Lynn Mostoller
317 Paseo de Peralta
Santa Fe, New Mexico 87501
(505) 988-5521
Fax: (505) 982-5297

*Counsel for Conan Doyle Estate Ltd.*

## **CERTIFICATE OF SERVICE**

    We hereby certify that on September __, 2013, we electronically filed the attached Response to Plaintiff's Material Facts with the Clerk of the Court using the CM/ECF system and sent by email and U.S. Mail such filing to the following:

Scott M. Gilbert
Kourtney A. Mulcahy
Hinshaw & Culbertson LLP
222 N. LaSalle Street
Chicago, IL
SGilbert@hinshawlaw.com

*Attorneys for Plaintiff Leslie S. Klinger*


SUTIN THAYER & BROWNE
A Professional Corporation

   /s/ *Benjamin Allison*
    Benjamin Allison

7085058.doc