IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LESLIE S. KLINGER, an individual, ) | |
| ) | |
| Plaintiff, ) | Case No.: 1:13-cv-01226 |
| ) | |
| v. ) | Judge: Ruben Castillo |
| ) | |
| CONAN DOYLE ESTATE, LTD., a business ) | Magistrate Judge: Sheila Finnegan |
| Entity organized under the laws of the United ) | |
| Kingdom, ) | |
| ) | |
| Defendant. ) | |

**CONAN DOYLE'S RESPONSE IN
OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT PURSUANT TO FRCP 56**

Defendant Conan Doyle Estate, Ltd. (Conan Doyle) hereby opposes Plaintiff's Motion for Summary Judgment as follows.

## INTRODUCTION

Sherlock Holmes is perhaps the most recognizable fictional character in modern literature. He is the creation of Sir Arthur Conan Doyle, who over a period of forty-one years wrote four novels and fifty-six short stories creating and developing Holmes's character. Of these sixty stories creating Sherlock Holmes, known as the Canon, the last ten stories are fully protected by United States copyrights.

Not content to wait for the last of these copyrights to expire in 2022, plaintiff Leslie Klinger seeks a declaration that his list of "Sherlock Holmes Story Elements" is in the public domain. While fifty of Sir Arthur's original Holmes stories are indeed in the public domain, Plaintiff's list includes material Plaintiff himself admits was created in Sir Arthur's last ten copyrighted stories (the Ten Stories). This admission alone requires denial of Plaintiff's requested summary judgment.

Even more significant, Plaintiff seeks a declaration that the fictional characters of Holmes and Watson are available for all to use. But Plaintiff does not argue for that in so many words or list

"the Sherlock Holmes character" or "the Dr. Watson character" on his list of allegedly free story elements. To have done so would have entailed answering the question whether those characters were created strictly in the public domain stories, or whether the characters' creation continued throughout the copyrighted Ten Stories. The facts are that Sir Arthur continued creating the characters in the copyrighted Ten Stories, adding significant aspects of each character's background, creating new history about the dynamics of their own relationship, changing Holmes's outlook on the world, and giving him new skills. And Sir Arthur did this in a non-linear way. Each of the Ten Stories is set at various points earlier in the two men's lives—and even late stories create new aspects of the men's youthful character. In other words, at any given point in their fictional lives, the characters depend on copyrighted character development.

By avoiding the question whether the literary characters were created in part in copyrighted stories, and instead listing parts of the characters from public domain stories (but even here slipping into admittedly copyrighted material) Plaintiff suggests that Holmes and Watson can be dismantled into partial versions of themselves. But a complex literary personality can no more be unraveled without disintegration than a human personality. While one case and one commentator have opined that in a series of works featuring the same character, the character is created in the first story in the series and enters the public domain along with that first story, those authorities addressed flat, simplistic entertainment characters. Such characters genuinely are created in the first work in a series, and succeeding works merely put the same character into new scenarios without the character continuing to be formed and developed.

No court has yet addressed this issue in the context of a literary character continuously created in a corpus of works. Although basic principles of copyright law apply, the outcome depends on the facts of when and where a character was created. A sufficiently distinct fictional character is recognized as an independent work of authorship with its own copyright. Such a character might be

2

created whole in one story, or might be created in an arc of 100 stories, but that character is a work of authorship separate from the stories.

The critical question then is *In what stories were the literary characters Sherlock Holmes and Dr. Watson created?* If the creation of the characters was complete in works published in the United States before 1923, the characters are in the public domain. If, however, the characters as works of authorship were only completed in copyrighted stories published in 1923 or after, the characters are works of authorship protected by United States copyright law.

The present dispute came about because Plaintiff co-edited a collection of short stories by contemporary writers using Sherlock Holmes and materials from the Canon. Plaintiff believed Conan Doyle's permission was not necessary, but his publisher disagreed and obtained a license from Conan Doyle. The book not only used Holmes and Watson but also used clear story elements from the copyrighted Ten Stories. Conan Doyle learned of Plaintiff's plans for a sequel when one of the contributors wrote to inform Conan Doyle that he intended to use one of Sir Arthur's fictional characters originating in the copyrighted 1926 story "The Three Gables." Plaintiff nonetheless seeks a declaration that his proposed new book will not violate Conan Doyle's copyrights.

## ARGUMENT
## I
## SHERLOCK HOLMES AND DR. WATSON, AS LITERARY CHARACTERS, ARE INDEPENDENT WORKS OF AUTHORSHIP PROTECTED BY COPYRIGHT

Fictional characters who are distinctly delineated have long been recognized as having their own copyright. *Nichols* v. *Universal Pictures Corp.*, 45 F.2d 119 (1930) (Learned Hand, J.) (holding copyright protection granted to a character if it is developed with enough specificity to constitute protectable expression). In *Gaiman v. McFarlane*, 360 F.3d 644, 660 (7th Cir. 2004), the court held that a stock comic book character was distinct enough to have its own copyright because his "age, obviously phony title ('Count'), what he knows and says, his name, and his faintly Mosaic facial features combine to create a distinctive character. No more is required for a character copyright."

3

*See also Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1266-67 (11th Cir. 2001) (Scarlet O'Hara and Rhett Butler from *Gone with the Wind* protected by copyright); *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 632 (2d Cir. 1982) (Tarzan); *Walt Disney Productions v. Air Pirates,* 581 F.2d 751, 755 (9th Cir. 1978) (Disney characters); *Salinger v. Colting*, 641 F. Supp. 2d 250, 254 (S.D.N.Y. 2009) (Holden Caulfield from *The Catcher in the Rye*).

Sherlock Holmes is among the most distinctive characters ever created—in fact courts have used him as an example of a highly delineated character obviously entitled to copyright protection. *Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co.,* 900 F. Supp. 1287, 1296 (C.D. Cal. 1995) ("Like Rocky, Sherlock Holmes, Tarzan, and Superman, James Bond has certain character traits that have been developed over time through the sixteen films in which he appears.").

Plaintiff in this case does not dispute that the literary character Sherlock Holmes is sufficiently distinct to be copyrightable—or that Sir Arthur's last Ten Stories are still protected by copyright. (Pl. Local R. 56.1(b)(3) Stmt. of Mat. Facts, ¶ 15.) (hereafter "Pl. Stmt. of Mat. Facts") Plaintiff takes an approach that appears eminently reasonable: a list of "the characters, character traits, dialogue, settings, artifacts, story lines and other story elements" introduced in Sir Arthur's pre-1923 public domain works. (Compl., at 5 & Ex. A.) This approach is reasonable for dialogue, artifacts, and story lines created in the pre-1923 works. But the characters of Holmes and Watson were not completely created in pre-1923 works—a fact Plaintiff's own list of "Sherlock Holmes Story Elements" admits. (*Id.*, Ex. A.)

### A. The Holmes and Watson Characters Were Created Throughout the Canon and Only Completed in the Final Copyrighted Stories

Although Holmes and Watson were introduced in Sir Arthur's 1887 novel *A Study in Scarlet*, the characters were not fully created or disclosed in that novel. Sir Arthur continued to create Holmes's and Watson's characters throughout the Canon, adding attributes, dimensions, background, and both positive and negative change in the characters until the last story. Plaintiff's

4

own "Sherlock Holmes Story Elements" admits that the following two out of its list of seven character traits of Dr. Watson were created in copyrighted stories:

- Second wife (only mentioned in copyrighted stories "The Illustrious Client" and "The Blanched Soldier")
- Former athlete ("The Sussex Vampire" [1924])

(Pl. Stmt. of Mat. Facts, Ex. A, at 2.)

What Plaintiff does not admit is the significance of these developments in creating Watson's character and his relationship with Holmes during the middle of the men's careers. As a result of Watson's second marriage he moves out of Baker Street, altering his relationship with Holmes and requiring Holmes instead of Watson to narrate two cases, one before Holmes's retirement from active practice ("The Blanched Soldier," 1926), the other well into his retirement ("The Lion's Mane," 1926). (Conan Doyle's Stmt. of Add'l Mat. Facts, ¶ 6(b), 6(j).). In a copyrighted 1926 story, Holmes calls Watson's remarriage and move "the only selfish action which I can recall in our association. I was alone." (*Id.*) The implications of Watson's second marriage are even more far-reaching for his own character and background, leading some scholars to surmise that Watson married not merely twice but as many as five times. (*Id.*) Because Plaintiff admits his "Sherlock Holmes Story Elements" contain copyrighted material, his motion cannot be granted.

Sherlock Holmes's character also undergoes significant changes and development in the copyrighted stories—but Plaintiff's list fails to mention this. (Pl. Stmt. of Mat. Facts, Ex. A.) Examples of Holmes' character development in copyrighted stories include:

- Holmes softens and grows more emotional over time, revealed in the copyrighted 1926 story "The Lion's Mane." (Conan Doyle's Stmt. of Add'l Mat. Facts, ¶ 6(a).)

- Holmes's and Watson's relationship develops dramatically in copyrighted stories. The copyrighted "The Three Garridebs" (1924) reveals how both men's character and relationship had changed. When the story's villain fires a gun at Holmes and Watson, wounding Watson, Holmes says:

    "You're not hurt, Watson? For God's sake, say you are not hurt!"

    It was worth a wound—it was worth many wounds—to know the depth of loyalty and love which lay behind that cold mask. The clear, hard eyes were dimmed for a moment, and the firm lips were

5

> shaking. For the one and only time I caught a glimpse of a great heart as well as a great brain. All my years of humble but single-minded service culminated in that moment of revelation.

This scene is critical for understanding the two characters, the way Holmes changed throughout the Canon, and the nature of his relationship with Watson over the years of their association. Plaintiff himself admits in one of his books that this copyrighted scene shows "Holmes's and Watson's relationship has grown from that of mere flatmates in 1881 to the closest of friendships." (*Id.*, ¶ 6(b).)

• Holmes changes from someone who cares little for dogs to someone with such great interest in them and their relationship to humans that, in the copyrighted "The Creeping Man" (1923), he intends to write a monograph on the subject. (*Id.*, ¶ 6(c).)

• Holmes's character takes on a darker cast in the Ten Stories, even becoming less racially tolerant—which Plaintiff himself acknowledged is "an attitude markedly different from his evident racial tolerance on view in [an earlier public domain] story." (*Id.*, ¶ 6(d).)

• Holmes is given a knowledge of medicine that he uses for detection—previously unknown about him from public domain stories. (*Id.*, ¶ 6(e).)

• the Ten Stories reveal that after Watson moved out of Baker Street, Holmes converted his practice into an "Agency" employing various informants and a "general utility man" named Mercer "who looks up routine business" for Holmes's Agency. (*Id.*, ¶ 6(f).)

• Holmes's famous retirement—the endpoint from which we learn of a gradual mellowing of his personality—is depicted only in the Ten Stories, where we learn that Holmes has given up London and his detective Agency and has moved to the South Downs of Sussex, quietly keeping bees and writing about nature. (*Id.*, ¶ 6(i).)

These examples do not list all copyrighted elements in the Ten Stories, only major aspects of Holmes's and Watson's character development; many more details could be identified by descending to greater levels of specificity in the Ten Stories. These facts do, however, establish that the "Holmes" and "Watson" referred to on Plaintiff's "Sherlock Holmes Story Elements" are works of authorship that incorporate copyrighted material. *McGraw-Edison Co. v. Walt Disney Prod.*, 787 F.2d 1163, 1173 (7th Cir. 1986) (holding genuine issues of material fact precluded summary judgment).

Moreover, Sir Arthur did not create Holmes's or Watson's character in a linear way. (Conan Doyle's Stmt. of Add'l Mat. Facts, ¶¶ 2, 4.) The last ten copyrighted stories did not merely develop Holmes and Watson's characters at the end of their lives. (*Id.*) All of the Ten Stories are set at various points earlier in the two men's lives, revealing aspects of their character as younger men. (*Id.*,

6

¶¶ 4-5.) Thus at any given point in their fictional lives, the two men's characters depend on the Ten Stories. It is impossible to split the characters into public domain versions and complete versions.

### B. A Literary Character Is a Single Integrated Work of Authorship

Plaintiff's "Sherlock Holmes Story Elements" does not ask for the complete Holmes or Watson characters to be declared in the public domain. Instead Plaintiff lists "As to Holmes himself" and "As to Dr. Watson," and then lists partial renderings of their characters. (Pl. Stmt. of Mat. Facts, Ex. A.) Doing so both sidesteps the question where the characters were created and implies that the characters can be unraveled.

The notion that an author's literary character can be dismantled into more and less complete versions is wrong for two related reasons. First, copyright law protects "works of authorship." 17 U.S.C. § 102 (1978). A character copyright recognizes that the character is a work of authorship separate from the stories in which the character appears. *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1175 (9th Cir. 2003) (holding characters "receive protection apart from the copyrighted work").

As a work of authorship, a character has one copyright; no decision suggests that a single character constitutes multiple works of authorship or has multiple copyrights. But the character as a single work of authorship may very well be created in multiple stories. *Anderson v. Stallone*, No. 87-0592 WDKGX, 1989 WL 206431, at *6 (C.D. Cal. 1989) (Rocky Balboa character as developed in three movies "constitute[s] expression protection by copyright independent from the story in which they are contained"); *Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co.,* 900 F. Supp. 1287, 1293–96 (C.D. Cal. 1995) (James Bond as defined in sixteen films protected by a character copyright).

Whether Holmes's character was complete in the first story or whether his creator developed a single organically developing person through all sixty stories is a question of fact. Not only are Holmes's and Watson's characters developed throughout the entire Canon, but the Ten Stories contribute dramatically to their characters. (Conan Doyle's Stmt. of Add'l Mat. Facts, ¶¶ 2–6.)

Plaintiff's position would create multiple personalities out of Sherlock Holmes: a "public domain" version of his character attempting to only use only public domain traits, next to the true character Sir Arthur created. But there are not sixty versions of Sherlock Holmes in the sixty stories;

7

there is one complex Sherlock Holmes. To attempt to dismantle Holmes's character is not only impossible as a practical matter, but would ignore the reality that Sir Arthur Conan Doyle created a single complex character complete in sixty stories. (Sayers Aff., ¶ 12.)

Because the Holmes and Watson characters as works of authorship were not complete until the Ten Stories were published in 1927, the copyrights protecting each character were not complete until 1927. Under United States copyright law, Plaintiff concedes, works of authorship published after 1922 are still protected by copyright. (Pl. Stmt. of Mat. Facts, Ex. B (listing the Ten Stories and conceding they "have not yet entered the public domain in the United States").) This is true even if prior works containing the character are in the public domain. *Metro-Goldwyn-Mayer*, 900 F. Supp. at 1293 (rejecting argument that MGM lost exclusive rights in James Bond character merely because Bond appeared in *Casino Royale* and *Never Say Never Again*, in which MGM had no copyright).

      **C.**    **Case Law and Commentary on this Issue are Based On Flat Entertainment Characters Completed in the First Story in a Series; No Court Has Yet Addressed This Issue in the Context of a Complex Literary <u>Character Created over a Substantial Corpus</u>**

              1.    *Silverman* Does not Address a <u>Character Created In a Substantial Corpus</u>

One case and one commentator argue that a character goes into the public domain along with the first work in a series featuring that character—on the grounds that the character was created in that first work. The case is *Silverman v. CBS, Inc.*, 870 F.2d 40, 50 (2d Cir. 1989), and it involved the characters Amos 'n' Andy. Their creators had assigned their rights to pre-1948 Amos 'n' Andy radio plays to CBS, and those radio plays were allowed to enter the public domain. *Id.* After 1948, CBS created several years' worth of copyrighted Amos 'n' Andy television shows. *Id.* at 42. The characters' original creators sought a declaration that the characters were in the public domain so that they could create a Broadway musical using Amos and Andy. *Id.* at 43.

The court actually held that the characters in their television versions were protected even though the underlying written radio scripts were in the public domain. *Id.* at 50. But in doing so,

8

the court also held that the Amos 'n' Andy characters revealed in those radio scripts went into the public domain along with the first scripts. *Id.*

This holding is factually appropriate for Amos 'n' Andy, who are flat entertainment characters created complete in the first few stories featuring them. (Woiwode Aff., ¶ 10.) A flat character is one "that is two-dimensional, without the depth and complexity of a living person; the opposite of a *round character*." (*Id.*) Flat characters do not continue to change in each new story; they merely find themselves in different scenarios bringing about changes in dialogue, not character. (*Id.*)

In literary fiction, by contrast, characters continue to develop, frequently upsetting a reader's expectations. (Sayers Aff., ¶ 5.) Sherlock Holmes is such character, having all of the complex background and maturing emotions, thoughts, relationships and actions that characterize human development over time. (*Id.*) One of the reasons for Holmes's unique appeal is precisely that Sir Arthur created surprising new facets of the Holmes character throughout the Canon. (*Id.*)

To turn *Silverman* into a rule that *any* character in a series is completely created in the first work in that series—while it would accurately reflect the creation of flat characters in an entertainment series—would contradict reality for dimensional literary characters like Sherlock Holmes. Such characters are created continuously through many works, and such a rule would dismantle those characters into fragments their authors did not create. (Woiwode Aff., ¶ 17; Sayers Aff., ¶ 12.) Many of literature's most important characters were created over a series of works, from Sophocles' *Oedipus* trilogy to the Adam Dalgliesh novels of P.D. James, the Sherlock Holmes stories of Conan Doyle, to William Faulkner's Yoknapatawpha novels and stories and their development of the characters in the Compson family, the Zuckerman novels of Philip Roth, the Rabbit novels of John Updike, and many others. (Woiwode Aff., ¶ 15; Sayers Aff., ¶ 11.) A rule that every character is created only in the first story about that character would be simply untrue as applied to Sherlock Holmes and many other literary characters. (Conan Doyle's Stmt. of Add'l Facts, ¶ 8.)

Although *Warner Bros. Entm't, Inc. v. X One X Prod.*, 644 F.3d 584 (8th Cir. 2011) followed *Silverman's* reasoning, its holding supports Conan Doyle. In *X One X*, film publicity posters, still photographs, and theater lobby cards for *The Wizard of Oz* and *Gone With the Wind* had entered the public domain, and a company began using the film characters on a variety of products. *Id.* at 590. The court held that the fact that still photographs showing characters from the movies were in the public domain *did not* inject the entirety of the film characters into the public domain, because these still images did not anticipate "the full range of distinctive speech, movement, demeanor, and other personality traits that combine to establish a copyrightable character." *Id.* at 598.

        2.    *Pannonia Farms* Offered a Dictum Without Benefit
              Of Factual or Legal Development or the Proper Parties

Plaintiff cites *Pannonia Farms, Inc v. USA Cable*, No. 03-7841, 2004 WL 1276842 (S.D.N.Y. June 8, 2004), in which a court addressed an infringement claim asserted by a pretender to the Conan Doyle copyrights. The court held that the plaintiff, an entity called Pannonia Farms, Inc., did not "own[] the copyrights, trademarks and related rights in the works of Sir Doyle," and this was the holding that decided the case. *Id.* at *6. But the court went further and stated in a dictum that *Silverman's* rule about the Amos 'n' Andy characters applied to Sherlock Holmes. *Id.* at *9.

The court did so without benefit of factual development on the creation of the character or briefing on the legal issues. The plaintiff (owner of no Conan Doyle rights) told the court it was not arguing that the Holmes and Watson characters were protected by copyright. *Id.* at *9 & n.19. Conan Doyle, the true owner of the rights, was not a party to the case and had no opportunity to present the facts to the court. The court and parties even got the number of copyrighted Conan Doyle stories wrong, saying only nine are still copyrighted when in fact ten are, as Plaintiff Klinger concedes here. Plaintiff Klinger acknowledges Conan Doyle was not a party to *Pannonia Farms*, thus conceding there was no opportunity for true factual development. (Pl. Mem. at 10 & n.2.)

        3.    Professor Nimmer's Opinion on this "Difficult Issue" is Based
              On Cartoon Characters and a Strained Analogy to Derivative Works

The late Professor Nimmer called the question Plaintiff presents a "difficult question":

> [M]ay the character depicted in all of the works be appropriated for use in a new story created by the copier? Assuming the character to be sufficiently developed as to be protectable, arguably such conduct would constitute an infringement of those works that remain in copyright. The better view, however, would appear to be that once a copyright in the first work that contained the character enters the public domain, then it is not copyright infringement for others to copy the character in works that are otherwise original with the copier, even though later works in the original series remain protected by copyright.

Melville B. Nimmer, *1 Nimmer on Copyright*, § 2.12, at 2.178.30-31. Out of the four cases Nimmer cited to support his view, only one involved literary characters—but in that case the entire original series had gone into the public domain. *Kurlan v. CBS, Inc.*, 256 P.2d 962, 968 (Cal. 1953) ("any property interest which [the original author] may have had in either the story or characters of "My Sister Eileen" has been lost by publication."). The case thus cannot shed light on the situation before this Court, where the Ten Stories are admittedly protected. In addition, the decision did not involve federal copyright law, but rather a state intellectual property statute. *Id.* at 805.

The three remaining cases Nimmer cited to support his view are all cartoon cases involving classic flat characters created in their entirety in a single work. *Gantz v. Hercules Pub. Corp.*, 182 N.Y.S.2d 450 (S. Ct. 1959) (comic strip character Melvin the Monster; again the entire original series of works was in the public domain); *CBS v. DeCosta*, 377 F.2d 315 (1st Cir. 1967) (Plaintiff tried to create a character named "Paladin" out of himself, by wearing black suit, mustache, and using calling cards saying "Have Gun Will Travel"; court found no copyright protection in the persona); *Grant v. Kellogg Co.*, 58 F. Supp. 48 (S.D.N.Y. 1944) (Snap, Crackle, and Pop, created on the back of a cereal box as mascots for Kellogg's Rice Krispies; again the figures' creator had transferred all his rights to Kellogg and had no remaining copyright interest at all, unlike Conan Doyle). None of these cases shed any light on the continuing creation of a single character in a corpus, with a number of stories critical to the character's development still protected by copyright.[1]

---

[1] Nor do *Siegel v. Warner Bros. Entm't Inc.*, 690 F. Supp. 2d 1048 (C.D. Cal 2009) or *Burroughs*, 683 F.2d 610, both cited by Plaintiff. *Siegel* involved Superman, another flat cartoon character, and the issue was whether an incomplete termination notice was harmless error, not whether the character or character elements had fallen

11

Behind Prof. Nimmer's view lay a faulty analogy to derivative works: he suggested that in a series about the same character, all stories after the first "are in a sense derivative works." *Nimmer*, § 2.12, at 2.178.31. The point of this analogy is that a derivative work only has copyright protection for its incremental additions to the original. *Id.* Nimmer thus suggested a rule that when a writer creates a series of works featuring a single literary character, the character was created only in the first work, and succeeding works are mere derivatives.

But an author's original series of works about a character are in no sense derivative works. A derivative work is statutorily defined as a work that recasts or adapts a prior work:

> A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work". 17 U.S.C. § 101 (1978).

The last 59 stories of the Canon are not derivative works under any fair reading of this statute; nor is it fair to call the last three of John Updike's Rabbit quartet "derivative works," or every Faulkner novel about the Compson family after the first a derivative. (Woiwode Aff., ¶¶ 15-16.) The arc of the character exists complete only in the series, so no single work or subset of the series can be considered derivative of any other subset. Nimmer's only support for his theory to the contrary was *Salinger v. Colting*, 641 F. Supp. 2d 250, 254 (S.D.N.Y. 2009). But Salinger wrote only one book about his character Holden Caulfield, and an infringer then pirated the character in an unauthorized derivative work. There was no series at all by Salinger, and the decision offers no support the notion that an author's own original series is derivative.

---

into the public domain. *Id.* at 1051–52, 1058–59, 1072–73. *Burroughs* also did not address whether Tarzan had entered the public domain. The majority opinion is that a film was "not substantially similar to plaintiffs' copyrighted work except to the extent permitted by [an agreement with the defendant]." *Burroughs*, 683 F.2d at 611 ("We express no opinion on whether the character of Tarzan is covered by copyright, but hold that MGM, in any event, had the right to use the character in its 1981 film.") *Burroughs* is not based even on an assumption that aspects of the Tarzan character were in the public domain. Judge Newman's concurring opinion relies on there being "no dispute that the delineation [of the Tarzan character] was complete upon the 1912 appearance of the first Tarzan title Tarzan of the Apes." *Id.* at 631. The facts here are the opposite: Sherlock Holmes was *not* complete in early stories.

## II
## EVEN UNDER *SILVERMAN'S* INCREMENTAL EXPRESSION TEST, PLAINTIFF'S PROPOSED USE OF HOLMES AND WATSON WOULD INVADE CHARACTER DEVELOPMENT IN THE TEN COPYRIGHTED STORIES

If the Court applied the analysis in *Silverman*—despite Holmes's creation throughout a corpus of works rather than in the first work—and concluded that a partial version of the Holmes character was in the public domain, Plaintiff would still be barred from invading any original expression in the Ten Stories. *X One X Prod.*, 644 F.2d at 596 ( "[F]reedom to make new works based on public domain materials ends where the resulting derivative work comes into conflict with a valid copyright"); *Silverman*, 870 F.2d at 50 (holding plaintiff "is entitled to use the public domain material from the pre-1948 scripts and may do so up to the point at which he copies original expression added to the pre-1948 radio scripts and protected by valid CBS copyrights").

It is impossible to make new uses of Sherlock Holmes and Dr. Watson without having some relationship between the two men. The famous push-pull of that relationship and its development from coldness to close friendship is created in the Ten Stories. (Stmt. Add'l Mat. Facts, ¶ 6.) No matter what point in their relationship one chooses, the spectrum itself is protected. (*Id.*)

In addition, the non-linear creation of Holmes's and Watson's characters makes it impossible to use them at any given point in their fictional lives without invading copyrighted character development in the Ten Stories. Plaintiff himself admits that Watson's youth is partly created in a copyrighted story and his marital status created in another. Conan Doyle has set out many more copyrighted aspects of the integrated development of each character. (Pl. Mem., Ex. A, at 2; Conan Doyle's Stmt. of Add'l Mat'l Facts, ¶ 6.) Highly creative fictional characters and works are at the core of copyright's subject matter and are entitled to strong protection. *Metro-Goldwyn-Mayer*, 900 F. Supp. at 1303 (holding James Bond entitled to strong copyright protection because "careful visual delineation of a fictional character as developed over sixteen films and three decades, requires greater protection of the fictional works at issue than that accorded more factually-based or scientific works.").

# III

## SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THERE IS NO CASE OR CONTROVERSY

### A.    An Actual Controversy Does Not Exist

In support of his claim of an actual controversy, Klinger relies on his efforts to publish *In the Company of Sherlock* (P.'s Stmt. Mat. Facts, ¶ 23), Conan Doyle's alleged interference with publication of the book (*Id.*, ¶ 21), and the question "whether the publication of *In the Company of Sherlock* by Plaintiff, his co-editor and their licensees infringes any copyright of Defendant." (Compl., ¶ 39.)

"The declaratory judgment plaintiff must be able to show that the feared lawsuit from the other party is immediate and real, rather than merely speculative." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 712 (7th Cir. 2002). Plaintiff does not allege, let alone offer evidence, that Conan Doyle threatened litigation. Plaintiff relies on Conan Doyle's statement that if he proceeded with bringing out his infringing book, he should "not expect to see it offered for sale by Amazon, Barnes & Noble, and similar retailers," because Conan Doyle works "with those company[ies] routinely to weed out unlicensed uses of Sherlock Holmes from their offerings." (Compl., ¶ 31.) This statement merely indicates Conan Doyle will continue to police online retailers and remove online infringing works under the Digital Millennium Copyright Act. It does not, as Plaintiff claims, establish "a reasonable" or any other "apprehension that Defendant will file suit against him." (*Id.*, ¶ 33.)

To bolster his position, Klinger references the earlier work he co-edited, *A Study in Sherlock*. (Compl., ¶ 26.) Although Plaintiff did not think that book required a license from Conan Doyle, his publisher disagreed and entered into a license agreement, mooting that controversy. (Compl., ¶ 26.)

### B.    The Court Should Decline Jurisdiction for Prudential Reasons

The Declaratory Judgment Act "has long been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007). Thus, even if an action for a declaratory judgment presents an actual controversy sufficient to pass constitutional muster, a court may refuse to grant

declaratory relief for prudential reasons. *Alcan Aluminum Ltd. v. Dep't of Revenue of State of Or.*, 724 F.2d 1294, 1298 (7th Cir. 1984). The Seventh Circuit has cautioned that a "[d]eclaratory judgment should not be granted to try particular issues without settling the entire controversy, or to interfere with an action already instituted." *Sears, Roebuck & Co., v. American Mut. Liab. Ins. Co.*, 372 F.2d 435, 438 (7th Cir. 1967) (internal quotation marks omitted).

Prudential considerations counsel against exercising jurisdiction even if Plaintiff could establish an actual controversy. Conan Doyle learned of Plaintiff's proposed new book, *In the Company of Sherlock Holmes*, when one of the contributing authors indicated he intended to use a undisputedly copyrighted character from the Ten Stories. (Conan Doyle's Stmt. Add'l Mat. Facts, ¶ 12.) At this point in the litigation, it is at best unclear whether Klinger is asking this Court to determine whether his new book infringes Conan Doyle's copyrights or whether he merely seeks an advisory opinion regarding the status of various Holmes-related story elements. What is clear is that Klinger relies on his plans to publish *In the Company of Sherlock Holmes,* and Conan Doyle's alleged interference with that publication, to establish an actual controversy. But Plaintiff has not offered the book to the Court or parties for an infringement determination to be made. In this posture the Court cannot resolve the claimed controversy—whether Plaintiff's planned new work infringes Conan Doyle's copyrights. *Sears, Roebuck & Co.*, 372 F.2d at 438 (Seventh Circuit has cautioned that a "[d]eclaratory judgment should not be granted to try particular issues without settling the entire controversy . . . .").

                                        Respectfully submitted,
                                        SUTIN THAYER & BROWNE PC

                                        By     /s/  *Benjamin Allison*
                                                     Benjamin Allison

William F. Zieske                               Tracy Hofmann
ZIESKE LAW                                       Lynn Mostoller
321 S Eastwood Dr. #222                 317 Paseo de Peralta
Woodstock, Illinois 60098               Santa Fe, New Mexico 87501
(312) 252-9599                             (505) 988-5521 / (505) 982-5297 fax
(312) 278-0955 fax                      *Counsel for Defendant Conan Doyle Estate Ltd.*

## **CERTIFICATE OF SERVICE**

We hereby certify that on September 10, 2013, we electronically filed the attached Response to Plaintiff's Motion for Summary Judgment Pursuant to FRCP 56 with the Clerk of the Court using the CM/ECF system and sent by email and U.S. Mail such filing to the following:

Scott M. Gilbert
Kourtney A. Mulcahy
Hinshaw & Culbertson LLP
222 N. LaSalle Street
Chicago, IL
SGilbert@hinshawlaw.com

*Attorneys for Plaintiff*


SUTIN, THAYER & BROWNE
A Professional Corporation

      */s/ Benjamin Allison*
      Benjamin Allison

7085004.doc