IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LESLIE S. KLINGER, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 1:13-cv-01226 |
| v. | ) | |
| | ) | Judge: The Hon. Ruben Castillo |
| CONAN DOYLE ESTATE, LTD., a business entity organized under the laws of the United Kingdom, | ) | |
| | ) | Magistrate Judge: The Hon. Sheila Finnegan |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

### PLAINTIFF'S RULE 56.1(b)(3) RESPONSE TO DEFENDANT'S STATEMENT OF ADDITIONAL MATERIAL FACTS

Plaintiff LESLIE S. KLINGER ("Plaintiff"), by and through his attorneys, Scott M. Gilbert and Kourtney A. Mulcahy of Hinshaw & Culbertson LLP, submits this Plaintiff's Rule 56.1(b)(3) Response to Defendant's Statement of Additional Material Facts.

### OBJECTION TO STATEMENT OF ADDITIONAL MATERIAL FACTS

Defendant's Statement of Additional Material Facts does not comply with Local Rule 56.1(b)(3)(C). Pursuant to that Rule, Defendant is limited to assert forty statements of additional facts in opposition to Plaintiff's summary judgment filings. The majority of the paragraphs in Defendant's Statements of Additional Fact contain multiple "facts," and generally serve as extended discussions of the Defendant's view on the issues presented in this litigation and non-material facts. For example, Paragraph 6 of the Plaintiff's Statement, which contains subparagraphs (a) – (l), conservatively contains no less than 22 assertions of "fact." Ultimately, the Defendant's Statement of Additional Material Facts is not compliant with the rules and should be disregarded by the Court. Additionally, many of the "facts" asserted are actually the Plaintiff's legal arguments and opinions in response to Plaintiff's Motion.

1

130659491v1 0943356

The Rule requires that "the numbered paragraphs should be short; they should contain only one or two individual allegations, thereby allowing easy response. Again, it is inappropriate to confuse the issues by alleging multiple facts in a single paragraph in hopes of one's opponent missing one." *CIVIX-DDI, LLC v. Celloco Partnership*, 387 F. Supp. 2d 869, 880 (N.D. Ill. 2005), citing *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). The Court "is not obligated … to scour the record looking for factual disputes." *Federal Trade Commission v. Bay Area Business Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005), citing Wa*ldridge v. Am. Hoechst Corp.* 24 F.3d 918, 922 (7th Cir. 1994).

When the Court is faced with a document that does not comport with the requirements of the Local Rule 56.1, it is not required to sift through the morass for what is proper and what is not. Rather, the court can choose to strike the noncompliant statement. That was the case in *In re Motorola Securities Litigation*, 505 F. Supp. 2d 501, 504 (N.D. Ill. 2007), where the district court ignored and did not consider any statements of facts made in the response to the Motion for Summary Judgment which did not comply with Rule 56.1. The Seventh Circuit has upheld this principle. Rather than picking through a noncompliant statement of facts, the Seventh Circuit upheld the district court's decision to strike an entire statement of facts for noncompliance with the local rules, thereby deeming admitted the movant's entire statement of facts. "[W]e find no abuse of discretion in the district court's decision to strike Bordelon's statement in its entirety. … [T]he district court is entitled to limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' statements." *Bordelon*, at 529.

Pursuant to this authority, Plaintiff objects to Defendant's Statement of Additional Material Facts, and requests that the Court exercise its discretion to disregard the non-compliant statement in resolving the Motion for Summary Judgment.

130659491v1 0943356

## RESPONSE TO STATEMENT OF ADDITIONAL MATERIAL FACTS

1.      Conan Doyle is a company owned by members of the family of Sir Arthur Conan Doyle. Conan Doyle's directors are Richard Doyle and Catherine Doyle Beggs, whose grandfather was Sir Arthur's brother Innes, and Richard Pooley, stepson of Sir Arthur's daughter Dame Jean Conan Doyle. (Lellenberg Aff., ¶ 11.)

**PLAINTIFF'S RESPONSE TO STATEMENT NO. 1:** Plaintiff lacks personal knowledge sufficient to agree or disagree with Statement No. 1 but stipulates to its accuracy for purposes of this Motion for Summary Judgment.

2.      Sherlock Holmes is perhaps the most famous character in modern literature. Part of the reason for his success and that of Dr. Watson is that while they are distinct and compelling from their first appearance, like real people they continue to develop and change throughout their fictional lives. In fact, the first two Sherlock Holmes novels, *A Study in Scarlet* and *The Sign of the Four*, made little impression upon the reading public; it was only after the characters were further developed in new short stories that the characters started to become widely recognized and followed. Holmes and Watson are not flat cartoon characters who simply go through a variety of scenarios. They are complex, constantly developing literary characters who continued to be revealed, to change, and to become more fully realized throughout all of Sir Arthur's stories about them. Their interests, likes and dislikes, attitudes, habits of mind, and personalities were created continuously, but not in a linear fashion, by Sir Arthur over sixty stories, taking Holmes and Watson from young men in their twenties into their early sixties. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

**PLAINTIFF'S RESPONSE TO STATEMENT NO. 2:** Plaintiff agrees with the various assertions in Statement No. 2 with the crucial exception that the characters of Sherlock

3

Holmes and Dr. Watson were fully delineated in the four novels and 46 stories that were written and published by Sir Arthur Conan Doyle prior to 1923. Indeed, the essential characteristics were established in the first story, published in 1887, and the rest of Sherlock Holmes Story Elements were fully delineated in the first 24 stories, all of which had been published by December 1893. (Supplemental Declaration of Leslie S. Klinger, dated September 25, 2013 ("Supp. Klinger Decl."), ¶3-7, Exhibit 1)

3.      The Holmes and Watson characters are each single works of authorship created throughout the Canon. Holmes's character was not complete with the first story, with 59 subsequent derivative variations as each successive story or novel was released. Holmes is a single individual who developed and changed in an organic way like a human person. Both his and Watson's arc as characters exist complete only in the entire Canon; no single published work or subset of the Canon can be considered derivative of any other subset. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

**PLAINTIFF'S RESPONSE TO STATEMENT NO. 3: Denied.**  All of the assertions in the foregoing statement are false. As noted in Plaintiff's Response to Statement No. 2, the characters of Sherlock Holmes and Dr. Watson were complete by 1893 if not earlier. (Supp. Klinger Decl., ¶3-7.)

4.      Sir Arthur did not develop Holmes's character in a strictly chronological way as the stories progressed. All of the last ten copyrighted stories are set in various points earlier in Holmes's life and reveal aspects of his character and background as a younger man. For this reason also it is not possible to split Holmes or Watson's characters into partial and full versions, or conclude that the characters are in the public domain up to a certain point in their fictional lives. It is also impossible for Plaintiff to take the Holmes or Watson

4

characters at any given point in their fictional lives without invading character development created in the last ten copyrighted stories. Use of the characters as they existed at any particular time in their lives necessarily uses character development from copyrighted stories. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

**PLAINTIFF'S RESPONSE TO STATEMENT NO. 4:** Plaintiff agrees with the following statement: "Sir Arthur did not develop Holmes's character in a strictly chronological way as the stories progressed. All of the last ten copyrighted stories are set in various points earlier in Holmes's life…" All of the other assertions in Statement No. 4 are denied because the characters of Sherlock Holmes and Dr. Watson were fully delineated in the four novels and 46 stories that were published prior to 1923, and the Ten Stories do not change or "complete" those characters. (Supp. Klinger Decl., ¶3-7.)

5. For instance, "The Blanched Soldier" (1926) and "The Lion's Mane" (1926) are both set earlier in Holmes's career than stories previously written by Sir Arthur, but after Holmes and Watson parted ways in stories set in the fictional 1903. The remainder of the copyrighted *Case-Book* stories temporally are scattered among the earlier stories and their time-settings. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

**PLAINTIFF'S RESPONSE TO STATEMENT NO. 5:** Plaintiff agrees with Statement No. 5 with the exception that "The Blanched Soldier" and "The Lion's Mane" were set later in Holmes's career than all but one story written by Sir Arthur ("His Last Bow") and earlier than that story (that is, they were set temporally between the other 57 stories and "His Last Bow") . (Supp. Klinger Decl., ¶4.)

6. The following are examples of dimensions and elements of Holmes's and Watson's characters created in post-1922 copyrighted stories:

a. Holmes softened and became more emotional over time, finally convincing himself in the copyrighted 1926 story "The Lion's Mane" that he needed "the soothing life of Nature." This dimension of Holmes's character is also developed in the copyrighted 1924 story "The Three Garridebs." When the story's villain fires a gun at Holmes and Watson, wounding Watson, Holmes says:

> "You're not hurt, Watson? For God's sake, say that you are not hurt!"
>
> It was worth a wound—it was worth many wounds—to know the depth of loyalty and love which lay behind that cold mask. The clear, hard eyes were dimmed for a moment, and the firm lips were shaking. For the one and only time I caught a glimpse of a great heart as well as a great brain. All my years of humble but single- minded service culminated in that moment of revelation.

This scene is of critical importance in understanding the two characters, the way Holmes changed, and the nature of his relationship with Watson over the years of their association, as discussed more fully next. (Lellenberg Aff., ¶ 11; Estleman Aff.,

¶ 14; Fletcher Aff., ¶ 10.)

b. Holmes's and Watson's relationship changes over the years, developing in the copyrighted stories into a truly close friendship. This maturing relationship cannot be quantified in a precise way in Holmes's character; it is a naturally changing dimension of his character shown in two copyrighted stories set at different points in Holmes's career:

In the 1926 story "The Blanched Soldier," Holmes must narrate the case himself because Watson is no longer his collaborator: Watson has remarried, moved out of Baker Street, and renewed his career as a doctor elsewhere. "Blanched Soldier" shows an earlier development in Holmes's and Watson's relationship, when Holmes calls Watson's remarriage "the only selfish action which I can recall in our association. I was alone."

"The Three Garridebs" (1924), on the other hand, quoted above, reveals the pinnacle of Holmes's and Watson's friendship in a copyrighted story. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

Plaintiff Klinger himself has written of this progressive character development revealed in copyrighted stories. In his *New Annotated Sherlock Holmes* (W.W.

6

Norton 2004) (hereafter *NASH*), published under license from Conan Doyle, Plaintiff writes of "The Three Garridebs": "Holmes expresses a moving concern for Watson's safety. Perhaps as a sign of Holmes's age (48) or his impending retirement in 1904 [sic], Holmes's and Watson's relationship has grown from that of mere flat-mates in 1881 to the closest of friendships." (*NASH* at 1581.)

Plaintiff also admits that Holmes's relationship with Watson is further developed in the copyrighted story "The Retired Colourman" (1926), as "Watson seems pleased to recollect his active partnership with Holmes." (*NASH* at 1730.) The story also introduces "Holmes's 'hated rival on the Surrey shore' (of whom we have heard nothing before)." (*Id.*) (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

c. Holmes grows from someone who cares little for dogs to someone with such great interest in them and their relationship to humans that, in the copyrighted story "The Creeping Man" (1923), Holmes intends to write a monograph on the subject. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

Plaintiff writes of this copyrighted story: "Holmes's attitude toward dogs has changed markedly from his cold (but not cruel) dog poisoning in *A Study In Scarlet*. Now Holmes sees dogs as the mirror of their household, and he even plans a monograph on the topic." (*NASH* at 1636.)

d. Holmes's character takes on a darker cast in the last collection of stories—and this too became part of who Sherlock Holmes is. He became less racially tolerant in a 1926 copyrighted story, for example. Plaintiff Klinger writes about this development in "The Three Gables" (1926): "Holmes's sarcastic remarks to Steve Dixie, certainly racist by modern standards, display an attitude markedly different from his evident racial tolerance on view in "The Yellow Face," an 1893 story." (*NASH* at 1534.) (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

e. It becomes clear from 1926 copyrighted story "The Blanched Soldier" that Holmes has acquired over time a knowledge of medicine, whereas previously he relied on Dr. Watson, absent from this story, for such guidance. Plaintiff writes of this story that it "demonstrates Holmes's knowledge of medicine rather than his detective skills," a new development in the character of Sherlock Holmes. (*NASH* at 1482.) (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

f. The copyrighted stories "The Sussex Vampire" (1924), "The Illustrious Client" (1924), and "The Creeping Man" (1923) reveal for the first time that Holmes has converted his practice into an "Agency" after Dr. Watson moved out of Baker Street. Holmes's Agency employs various informants and a "general

7

utility man" named Mercer "who looks up routine business" for the Agency. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10; *NASH* at 1449, 1555, 1636.)

g. Holmes embraces modern technologies for the first time in copyrighted stories, revealing that he kept current with technological change and adopted it in his practice. Sir Arthur introduced telephones at 221B Baker Street in "Illustrious Client" (1924), "Three Garridebs" (1924), and "Retired Colourman" (1926), along with telephone directories in two of these stories. In another copyrighted story, "Shoscombe Old Place" (1927), Holmes pioneers "the use of the microscope as an investigative tool," in Plaintiff's words, and in "The Lion's Mane" (1926), Holmes employs photographic analysis for detection, which Plaintiff concedes was "not previously mentioned among the various techniques Holmes employs throughout the Canon." The same copyrighted story brings Holmes into contact with the "wireless" radio, another piece of technology that did not exist for some decades when the Sherlock Holmes stories were new. (*NASH* at 1449, 1581, 1730, 1707, 1667; Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

h. In "The Sussex Vampire" (1924), we first find out about "Holmes's great index," a reference tool of his own invention with references also to such unrecorded cases of his as Victor Lynch, the forger; the giant rat of Sumatra, "a story for which the world is not yet prepared"; Vanderbilt and the Yeggman; Vittoria the Circus Belle; and Vigor, the Hammersmith Wonder." Each of these were mentioned in the copyrighted "Sussex Vampire" story with details noted in "Holmes's great index," compiled over many years but revealed for the first time in this 1924 *Case-Book* story. (*NASH* at 1555.) (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

i. Holmes's famous retirement is depicted only in the 1924 copyrighted story "The Lion's Mane." From this story we learn that Holmes has given up his detective Agency, is no longer living in London, and has moved to the South Downs of Sussex, where he lives quietly keeping bees and writing about nature subjects. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

Plaintiff admits that this copyrighted story "is the Canon's only depiction of Holmes's retirement. July 1907 sees Holmes in residence in Sussex, and the story gives many clues as to the location of Holmes's last known home (where readers long to believe he still lives). Maud Bellamy, whose fiancée is the victim of the alleged crime, is a singularly attractive figure, and some suggest that Holmes had 'feelings' for her, something at great variance with Sherlock Holmes's earlier notorious misogyny about which Dr. Watson remarked repeatedly in earlier stories." (*NASH* at 1667.)

j. Watson's character is also created and developed in copyrighted stories—and Plaintiff's own Ex. A list of character traits acknowledges this. Two out of the

8

seven Watson character traits Plaintiff lists in his Ex. A are from admittedly copyrighted stories. First, Watson's second marriage and departure from the Baker Street flat comes from two copyrighted stories, "The Illustrious Client" (1924) and "The Blanched Soldier" (1926), as Plaintiff acknowledges. (Compl., Ex. A, at 2.)

What Plaintiff does not acknowledge is the significance of this development in developing Watson's character and altering his relationship with Holmes. As a result of Watson's second marriage and move, Holmes instead of Watson is required to narrate two cases, one prior to his retirement from active practice ("The Blanched Soldier," 1926), and the other well into Holmes's Retirement, "The Lion's Mane" (1926). The implications of Watson's second marriage are significant for his character and background, including even leading some scholars to surmise Watson married not only twice but as many as five times, starting before he and Holmes ever met. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

k.  Second, Watson's background as a former athlete is revealed only in the copyrighted 1924 story "The Sussex Vampire," reflecting new light back onto his character in his younger years. Again, Plaintiff's own description of Watson's supposedly public domain character admits that this dimension of Watson's character is created in a copyrighted story. (Compl., Ex. A, at 2.)

Plaintiff writes elsewhere about "Sussex Vampire" (1924) that it contains the only "[r]eferences to Watson's youth, when he played rugby for Blackheath." (*NASH*, at 1555; Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

l.  The 1927 story "Shoscombe Old Place" also reveals that among Dr. Watson's habits is a serious over-fondness for horse-racing, which he pays for with "half my wound pension." This is the last Holmes story Sir Arthur wrote, but like all the *Case-Book* stories, it is set earlier in Watson's life. (Lellenberg Aff., ¶ 11; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

These are broad outlines of developments in Holmes and Watson's characters in the Ten Stories. A great many finer details of character development can be identified as one reaches greater levels of specificity in the copyrighted Ten Stories. In addition, the foregoing list is not intended to identify all protected material in the Ten Stories; it makes no effort to identify copyrighted dialogue, settings, plots, new characters, or other story elements in the Ten Stories beyond Holmes and Watson's characters. (Lellenberg Aff., ¶ 11.)

9

**PLAINTIFF'S RESPONSE TO STATEMENT NO. 6:** Plaintiff responds to Statement No. 6 and its subsections by generally denying that any of the particulars cited by Defendant relate to the Sherlock Holmes Story Elements as they are set forth in Plaintiff's Complaint in the present action and the moving papers in support of Plaintiff's Motion for Summary Judgment.

Plaintiff has conceded, for the purpose of the present Motion for Summary Judgment, that any new, original and <u>copyrightable</u> elements that appear for the first time in the Ten Stories remain within the control of Defendant until the copyrights in the Ten Stories expire. Statement No. 6 generally refers to <u>events</u> rather than <u>characteristics</u> of Sherlock Holmes and Dr. Watson and do not figure at all in the Sherlock Holmes Story Elements that are at issue in the present case. (Supp. Klinger Decl., ¶5.)

By way of example, Dr. Watson's "departure from the Baker Street flat," which Defendants mentions in Statement No. 6(j), and Watson's playing Rugby in his younger pre-Holmes days (mentioned indirectly in Statement No. 6(k)) are events in the fictional lives of Holmes and Watson, not essential elements of their characters. Moreover, Defendant is wrong in asserting that Watson's departure is first described in post-1923 stories; in fact, Watson's departure from Baker Street is first mentioned in "His Last Bow," which is set in 1914 and was published in 1917. As for Defendant's assertion in Statement No. 6(j) that Dr. Watson entered into a second marriage, this does not even rise to the dignity of a fact; scholars who have studied the Canon agree that Dr. Watson's marriage is first mentioned in many of the pre-1923 stories but they do not agree that a second marriage took place at all. (Supp. Klinger Decl., ¶6.)

By way of further example only, and for the sake of argument only, if Defendant asserts that Sherlock Holmes as he appears in the pre-1923 novels and stories is someone who "cares little for dogs," and Sherlock Holmes as he appears in the Ten Stories is someone with a "great

10

interest in them" — and if the slight change in the temperature of his affection for dogs is itself copyrightable — then an argument can be made that a depiction of Sherlock Holmes as one who is indifferent to dogs is permissible and the depiction of Sherlock Holmes as an admirer of dogs is not permissible. The Court, however, need not address this point because Plaintiff has already conceded that whatever is new and original to the stories and protectable under copyright is not in the public domain. Plaintiff seeks only a ruling of the Court that the Sherlock Holmes Story Elements, all of which appear in pre-1923 works, are in the public domain and available for use by Plaintiff and the public. (Complaint, ¶23, 40-42; Supp. Klinger Decl., ¶3-7.)

7.       While the author of the Holmes and Watson characters continued to create their characters throughout his series of stories about them, the same is often not true of flat or cartoon characters in a series. A cartoon character is generally complete in the first—or perhaps first few— stories about him or her. A cartoon character is then put into new scenarios without the character itself continuing to develop or take on further dimension. The Harper Handbook of Literature defines a flat character as "a character that is two-dimensional, without the depth and complexity of a living person; the opposite of a round character" (195). The characters Amos and Andy from the eponymous series of radio plays are a classic example of "flat characters;" they never change — merely find themselves in different situations that bring about changes in dialogue, not character. Readers look to many works of popular entertainment for reassurance that the world works exactly as they think it does. It is crucial in such flat works that characters do not alter dramatically. In literary fiction, by contrast, characters continue to develop, frequently upsetting or surprising a reader's expectations. (Woiwode Aff., ¶¶ 9, 10; Sayers Aff., ¶¶ 5-7.)

**PLAINTIFF'S RESPONSE TO STATEMENT NO. 7:** Plaintiff agrees with the

assertion in Statement No. 7 that "[in] literary fiction…characters continue to develop…," but disagrees with any suggestion by Defendant that Sherlock Holmes or Dr. Watson continued to develop in any meaningful way in the Ten Stories, all of which are consistent with the characteristics of these characters as established in the works published prior to 1923. Plaintiff also disagrees with the assertion that "[i]t is crucial in such flat works that characters do not alter dramatically" or that changes in characters in literary fiction are "frequently upsetting or surprising a reader's expectations." Other than as set forth in the preceding sentence, Plaintiff does not dispute the rest of the assertions in Statement No. 7 but regards them as inapplicable to the present case. (Supp. Klinger Decl., ¶3, 5-7.)

8.     A serious literary character continues to be formed and takes on further attributes and dimensions through every story about that character. In addition to Sherlock Holmes, many other significant literary characters have been developed by their authors over a series of works, including iconic fictional characters in works by William Faulkner, Philip Roth, John Updike, John Cheever, Larry Woiwode, Valerie Sayers, P.D. James, and Loren Estleman. The creation of a substantial character throughout multiple works is a reality of some of the world's great literature going back at least to Sophocles's *Oedipus* trilogy. If a rule were imposed that a character in a series is completely created in the first work in that series, such a rule would fit the creation of cartoon characters and of many flat characters in entertainment series, in which the characters are complete in the first work and simply go through varying scenarios and dialogue. But such a rule would do violence to the creation of dimensional literary characters over a series of works in which authors continue to develop, expand, mature, and change the characters until the end. Such a rule applied to literary characters without looking to see where the actual development of the

character ends would dismantle characters into fragments that their authors did not create. (Woiwode Aff., ¶¶ 6–17; Sayers Aff., ¶¶ 5–11.)

**PLAINTIFF'S RESPONSE TO STATEMENT NO. 8:** Plaintiff denies that the characters of Sherlock Holmes and Dr. Watson were fully delineated in the four novels and 46 stories that were published prior to 1923, and the Ten Stories do not change or "complete" those characters. (Supp. Klinger Decl., ¶3.). Plaintiff further denies that the assertions within this Paragraph constitute a "fact" for purposes of L.R. 56.1(b)(3)(C) or are material to this Motion.

9. To say that a character is fully created in one book when the author has continued that character's creation in later books is equivalent to saying that a character in a novel is complete in the first chapter, or that a fully-developed person is present at birth. Such statements are at odds with reality if an author created the character over a series of chapters or books—just as most people continue to change and be forged as they move through life. (Woiwode Aff., ¶ 9; Sayers Aff., ¶ 6; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

**PLAINTIFF'S RESPONSE TO STATEMENT NO. 9:** Plaintiff denies that the characters of Sherlock Holmes and Dr. Watson were fully delineated in the four novels and 46 stories that were published prior to 1923, and the Ten Stories do not change or "complete" those characters. (Supp. Klinger Decl., ¶3-7.). Plaintiff further denies that the assertions within this Paragraph constitute a "fact" for purposes of L.R. 56.1(b)(3)(C).

10. Moreover, even when a literary character is created by an author in a series of chapters, stories, or books, that character is a single creation. The various stories and books about him do not contain so many "derivative" or "variant" versions of the character. A literary character is not divisible, though it has many dimensions—like any other person's character. To attempt to dismantle a literary character like Sherlock Holmes

is not only impossible as a practical matter, but would ignore the reality that Sir Arthur Conan Doyle created a single complex Sherlock Holmes complete in sixty stories. (Woiwode Aff., ¶¶ 12, 17; Sayers Aff., ¶ 6, 12; Estleman Aff., ¶ 14; Fletcher Aff., ¶ 10.)

**PLAINTIFF'S RESPONSE TO STATEMENT NO. 10:** Plaintiff denies that the characters of Sherlock Holmes and Dr. Watson were fully delineated in the four novels and 46 stories that were published prior to 1923, and the Ten Stories do not change or "complete" those characters. (Supp. Klinger Decl., ¶3-7.). Plaintiff further denies that the assertions within this Paragraph constitute a "fact" for purposes of L.R. 56.1(b)(3)(C).

11.     *A Study in Sherlock*, the short story collection Plaintiff co-edited in 2011, was published under license from Conan Doyle, although Plaintiff contended then and contends now that his book used only the portion of Sherlock Holmes's character from public domain stories. In fact, at least four of the sixteen stories in *A Study in Sherlock* used clear story elements from copyrighted *Case-Book* stories:

• "You'd Better Go in Disguise," by Alan Brady, refers to wireless radio, to alienist psychology and Sigmund Freud, elements from the *Case-Book* stories "Creeping Man" (1923), "Sussex Vampire" (1924), and "Lion's Mane" (1926), and to Simpson's, the actual London restaurant where Holmes and Watson dine in "Illustrious Client" (1924).

• "As to an 'Exact Knowledge of London,'" by Tony Broadbent, has Holmes and Watson using electronic apparatus of the 20th and 21st centuries, including the wireless radio ("Illustrious Client", 1924), and uses Holmes's new life as a bee-keeper ("The Lion's Mane" (1926)), which Plaintiff in *The New Annotated Sherlock Holmes* calls "the Canon's only depiction of Holmes's retirement," as well as the unrecorded case of the Politician, the Lighthouse, and the Trained Cormorant from "The Veiled Lodger" (1927).

• "The Startling Events in the Electrified City" by Thomas Perry has Holmes speaking about "the wonders of electricity," not present in Baker Street until the *Case-Book* stories "Illustrious Client" (1924), "Three Garridebs" (1924), and "Retired Colourman" (1926) in a plot that relies upon Dr. Watson's second marriage and new medical practice from "Blanched Soldier" (1926). The story concludes with an explicit reference to the *Case-Book* story "Sussex Vampire" (1924).

14

• "The Case of Death and Honey" by Neil Gaiman dives deep into Sherlock Holmes's Sussex bee-keeping life described in "The Lion's Mane" (1926), as Plaintiff points out himself in an editorial afterword to the story, and also refers to another copyrighted *Case- Book* story, "The Creeping Man" (1923).

(Lellenberg Aff., ¶ 11.)

**PLAINTIFF'S REPONSE TO STATEMENT NO. 11:** Plaintiff does not disagree with the descriptions of various aspects of the stories in *A Study in Sherlock* or that the book was published under license from Defendant, but regards Statement No. 11 in its entirety as irrelevant since the stories in *A Study in Sherlock* are not at issue in the present case. (Supp. Klinger Decl., ¶3.) Furthermore, the "violations" cited by Defendant of Defendant's rights that would have occurred prior to obtaining a license are references to *events* or "facts" in the fictional biographies of Sherlock Holmes as described in the Ten Stories, not the Sherlock Holmes Story Elements. (Supp. Klinger Decl., ¶5.)

12.  Plaintiff has begun co-editing a new short-story collection tentatively entitled *In the Company of Sherlock Holmes* as alleged in his Complaint at ¶¶ 3, 27–34. Conan Doyle learned of the proposed new book when one of the writers invited to contribute to it, the literary historian and critic Michael Dirda, informed Conan Doyle that he intended to use Sir Arthur's fictional character Langdale Pike, originating in the copyrighted 1926 *Case-Book* story "The Three Gables," in his story for Plaintiff's new book. (Lellenberg Aff., ¶ 11.)

**PLAINTIFF'S RESPONSE TO STATEMENT NO. 12:** Plaintiff does not disagree with Statement No. 12 except to the extent that Defendant is suggesting that Defendant insisted on a license only for the use of copyright-protected elements in the Ten Stories. In fact, Defendant demanded that Plaintiff or his publisher pay for a license for the use of <u>any</u> material from the Canon, including any material from the pre-1923 works in their entirety, all of which are now in the public domain, which ultimately led Plaintiff's publisher to refuse to finalize a

15

130659491v1 0943356

contract with Plaintiff. (Supp. Klinger Decl., ¶8.) In addition, Klinger specifically advised Dirda

that in order to accept a story based on Langdale Pike, Klinger would insist that the Defendant

grant Dirda permission to use the character. (Supp. Klinger Decl., ¶9.)


Scott M. Gilbert, ARDC No. 6282951      Respectfully Submitted,
Kourtney A. Mulcahy, ARDC No. 6276695   LESLIE S. KLINGER
HINSHAW & CULBERTSON LLP
222 N. LaSalle Street             By: /s/Scott M. Gilbert_____
Chicago, IL 60601                 One of Plaintiff's Attorneys
Phone No.: 312-704-3000
Fax No.: 312-704-3001

130659491v1 0943356

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2013, Plaintiff's Rule 56.1(b)(3) Response to Defendant's Statement of Additional Material Facts was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

By:     s/ Scott M. Gilbert
        HINSHAW & CULBERTSON LLP
        222 N. LaSalle Street, Ste 300
        Chicago, IL 60601
        (312) 704-3000

130659491v1 0943356