## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **LESLIE S. KLINGER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 13 C 1226** |
| **v.** | ) | |
| | ) | **Chief Judge Rubén Castillo** |
| **CONAN DOYLE ESTATE, LTD.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Leslie S. Klinger ("Klinger") brings this copyright action against Defendant Conan Doyle Estate, Ltd. ("Conan Doyle"), seeking a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. Specifically, Klinger seeks a declaration that various characters, character traits and other story elements from Sir Arthur Conan Doyle's Sherlock Holmes stories are free for the public to copy without infringing Conan Doyle's rights under the Copyright Act, 17 U.S.C. § 101 *et seq.* Presently before the Court is Klinger's motion for summary judgment. For the reasons set forth below, the Court grant's Klinger's motion in part and denies it in part.

### RELEVANT FACTS[1]

Sir Arthur Conan Doyle authored four novels and fifty-six short stories (collectively, "the Canon") featuring the fictional characters of detective Sherlock Holmes and his friend and colleague Dr. John H. Watson. (Conan Doyle's Rule 56.1 Resp. ¶¶ 1, 8.) Sir Arthur Conan

---

[1] The Court takes the undisputed facts from the parties' Local Rule 56.1 statements of material facts. (R. 13, Klinger's Local Rule 56.1 Statement of Material Facts ("Klinger's Facts"); R. 27, Conan Doyle's Local Rule 56.1 Response to Klinger's Facts ("Conan Doyle's Rule 56.1 Resp."); Conan Doyle's Statement of Additional Facts ("Conan Doyle's Facts"); and R. 29, Klinger's Response to Conan Doyle's Facts ("Klinger's Rule 56.1 Resp.").)

Doyle first introduced these characters in "A Study in Scarlet," which was first published in *Beeton's Christmas Annual* in 1887 and first released in the United States in 1890. (Conan Doyle's Rule 56.1 Resp. ¶ 8.) The four novels and forty-six of the fifty-six short stories were first published in the United States on various dates prior to January 1, 1923.[2] (Conan Doyle's Rule 56.1 Resp. ¶ 11.) The ten short stories remaining under copyright protection (the "Ten Stories") are set forth in Exhibit B to the complaint. (R. 1-2, Ex. B, Ten Stories.)

Conan Doyle is a company owned by members of Sir Arthur Conan Doyle's family. (Klinger's Rule 56.1 Resp. ¶ 1.) Conan Doyle licenses its intellectual property, including copyrights, in the works of Sir Arthur Conan Doyle to third parties through its exclusive authorized licensing agents in the United States. (Conan Doyle's Rule 56.1 Resp. ¶ 5.) Klinger is the author and editor of twenty-seven books and dozens of articles in the mystery and thriller literature genre, including two dozen books and numerous articles on Sherlock Holmes and the Canon. (Conan Doyle's Rule 56.1 Resp. ¶ 1.)

## I.      *A Study in Sherlock*

Klinger is the co-editor, along with Laurie R. King, of *A Study in Sherlock*, an anthology of new and original short stories by contemporary authors. (Conan Doyle's Rule 56.1 Resp. ¶ 2.) The stories in *A Study in Sherlock* were inspired by the Canon and feature various characters and story elements from the Canon. (Conan Doyle's Rule 56.1 Resp. ¶ 2.) Klinger and King entered into a contract with Random House to publish the anthology. (Conan Doyle's Rule 56.1 Resp. ¶

---

[2] Both parties agree that the works in the Canon published prior to 1923 are in the public domain. (Conan Doyle's Rule 56.1 Resp. ¶ 13.) *See* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 9.11[B][1] ("[W]orks first published through the end of 1922 remain unprotected today."); *see also Societe Civile Succession Guino v. Renoir*, 549 F.3d 1182, 1189 (9th Cir. 2008) ("[T]he U.S. copyright in any work published or copyrighted prior to January 1, 1923, has expired by operation of law, and the work has permanently fallen into the public domain in the United States.") (internal citations omitted).

2.) Before Random House published *A Study in Sherlock*, Conan Doyle intervened to assert its exclusive copyright over the use of the characters Sherlock Holmes and Dr. Watson. (Conan Doyle's Rule 56.1 Resp. ¶ 21.) Conan Doyle informed Random House that it must enter into a licensing agreement with it in order to publish the anthology. (*Id.*) Although Klinger and King believed that the law did not require them to obtain a license, Random House disagreed and entered into a licensing agreement with Conan Doyle. (*Id.*)

## II.    *In the Company of Sherlock Holmes*

Klinger and King are also the co-editors of a sequel to *A Study in Sherlock*, currently titled *In the Company of Sherlock Holmes*, which is another collection of new and original short stories featuring various characters and story elements from the Canon. (Conan Doyle's Rule 56.1 Resp. ¶ 3.) Klinger and King are currently preparing *In the Company of Sherlock Holmes* for publication by Pegasus Books and distribution by W.W. Norton & Company. (*Id.*) At Klinger's insistence, literary critic and historian Michael Dirda, a contributing author to the new anthology, informed Conan Doyle of his intention to use Sir Arthur Conan Doyle's fictional character Langdale Pike in his new story. (Klinger's Rule 56.1 Resp. ¶ 12; R. 29-1, Klinger's Suppl. Decl. ¶ 9.) The character originated in the short story "The Three Gables," published in the 1926 *Case-Book*, which is currently under copyright protection. (*Id.*)

An agent acting on behalf of Conan Doyle contacted Pegasus Books and insisted that the publisher obtain a license from Conan Doyle in order to publish *In the Company of Sherlock Holmes*. (Klinger's Facts ¶ 21 (citing R. 13-4, Klinger's Decl. ¶ 3).) Conan Doyle further informed Pegasus Books that it works with retailers such as Amazon and Barnes & Noble to weed out unlicensed uses of Sherlock Holmes and "[would] not hesitate to do so with your book as well." (Klinger's Facts ¶ 21 (citing R. 1, Compl. ¶ 31).) Out of fear of litigation, Pegasus

3

Books refused to finalize its contract with Klinger and King to publish *In the Company of Sherlock Holmes*. (R. 29-1, Ex. A, Hancock E-mail.) Klinger believes that a license is unnecessary to use the Sherlock Holmes Story Elements in the new anthology, (Klinger's Facts ¶ 21 (citing R. 1, Compl. ¶ 30)), whereas Conan Doyle asserts that using the characters of Sherlock Holmes and Dr. Watson in the anthology requires a license, (Conan Doyle's Rule 56.1 Resp. ¶ 21). In order to proceed with the publication of *In the Company of Sherlock Holmes*, Klinger seeks to have this Court determine the copyright status of a list of specific characters, character traits, dialogue, settings, artifacts, and other story elements in the Canon (the "Sherlock Holmes Story Elements") (R. 1-1, Ex. A, Sherlock Holmes Story Elements). (Klinger's Facts ¶ 21 (citing R. 1, Compl. ¶ 34).)

## PROCEDURAL HISTORY

Klinger initiated this action on February 14, 2013. (R. 1, Compl.) In Count I, the sole count of the complaint, Klinger seeks a declaratory judgment establishing that the public is entitled to copy the expression embodied in the Ten Stories set forth in Exhibit B, (R. 1-2, Ex. B, Ten Stories), and as to the Sherlock Holmes Story Elements set forth in Exhibit A, (R. 1-1, Ex. A, Sherlock Holmes Story Elements). On June 25, 2013, the Court entered a default against Conan Doyle for failure to timely appear, answer, or otherwise plead to the complaint.[3] (R. 10, Min. Entry.) The Court permitted Klinger to proceed with filing either a motion for summary judgment or a motion for default judgment. (*Id.*) On July 29, 2013, Klinger filed a motion for

---

[3] Upon entry of default, the Court takes all well-pleaded allegations in Klinger's complaint as true. *Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983). The entry of a default order does not, however, preclude a party from challenging the sufficiency of the complaint. *Black v. Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994) (internal citations omitted). *See* 10A Charles Alan Wright et al., Federal Practice and Procedure § 2688 (3d ed. 1998) ("Even after the default, however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law.")

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (R. 11,

Klinger's Mot. Summ. J.) This fully briefed motion is presently before the Court.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion

for summary judgment, the Court does not evaluate the weight of the evidence, judge the

credibility of the witnesses, or determine the ultimate truth of the matter; instead, the Court's role

is simply to ascertain whether there exists a genuine issue of material fact. *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "A disputed fact is 'material' if it might affect the

outcome of the suit under governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th

Cir. 2009) (citing *id.* at 248). In determining whether a genuine issue of material fact exists, the

Court must view the evidence in the light most favorable to the non-movant and draw all

reasonable inferences in his favor. *Anderson*, 477 U.S. at 255; *see Omnicare, Inc. v.

UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) ("Even on summary judgment,

district courts are not required to draw every requested inference; they must only draw

reasonable ones that are supported by the record.")

The moving party has the initial burden of demonstrating that it is entitled to summary

judgment. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). The moving party "can

prevail just by showing that the other party has no evidence on an issue on which that party has

the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir.

1993) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party has

met this burden, the non-moving party must "set forth specific facts showing that there is a

genuine issue for trial." *Celotex*, 477 U.S. at 322 n.3 (quoting Fed. R. Civ. P. 56(e) (1987)). The non-moving party may not rely on "mere conclusions and allegations" to create a genuine issue of material fact. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 247-48). In order to defeat a motion for summary judgment, the non-moving party "must make a showing sufficient to establish any essential element of her cause of action for which she will bear the burden of persuasion at trial." *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). The Court's inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

\       On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements of material facts. *See Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000) (referring to Local Rules 12(M) and (N), which were replaced by Local Rule 56). To adequately dispute a statement of fact, the opposing party must cite specific support in the record; an unsubstantiated denial or a denial that is mere argument or conjecture is not sufficient to create a genuinely disputed issue of material fact. *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000); *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008).

## ANALYSIS

## I.       Availability of Declaratory Judgment

As a preliminary matter, the Court addresses a threshold issue regarding Klinger's request for declaratory relief. The Declaratory Judgment Act (the "DJA") authorizes a federal court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other

legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). The DJA

does not confer subject matter jurisdiction, and therefore the Court must "possess an independent

basis for jurisdiction." *GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 619 (7th Cir. 1995)

(citing *Skelly Oil Co. v. Phillips Petroletum* Co., 339 U.S. 667, 671 (1950)). Here, Klinger

invokes federal question jurisdiction, 28 U.S.C. § 1331, pursuant to the Copyright Act, 17 U.S.C.

§ 101 *et seq*, as well as a jurisdiction-enabling statute relating to copyrights, 28 U.S.C. 1338(a).

(R.1, Compl. ¶ 6.) The Court is thus satisfied that it possesses an independent basis for

jurisdiction over the case.

The DJA's "actual controversy" requirement is equivalent to Article III's case-or-

controversy requirement. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

Conan Doyle contends that no "actual controversy" exists because Klinger faced no reasonable

apprehension of litigation. (R. 28, Conan Doyle's Mem. at 14.) Klinger argues that the threat of

litigation is not necessary to establishing an actual controversy, or in the alternative, that Conan

Doyle's threat to police online retailers pursuant to the Digital Millennium Copyright Act

("DMCA") constitutes a threat sufficient to create an actual controversy within the meaning of

the DJA. (R. 30, Klinger's Reply at 12.)

In *MedImmune, Inc. v. Genentech, Inc.*, the Supreme Court reiterated that the case or

controversy requirement of Article III can be satisfied without a threat of litigation. 549 U.S. at

132-33. The Court explained that whether an actual controversy exists depends on "whether the

facts alleged, under all the circumstances, show that there is a substantial controversy, between

parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance

of a declaratory judgment." *Id.* at 127 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S.

270, 273 (1941)). The Court stated that in choosing between abandoning his rights or risking

prosecution, a potential infringer faces "a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Id.* at 129 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967)). Dispelling the "reasonable apprehension of litigation" test Conan Doyle relies on here, the Court cited cases in which declaratory judgment jurisdiction was proper despite there being no indication of litigation. *Id.* at 132 n.11 (citing *Md. Cas. Co.*, 312 U.S. at 273, and *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239 (1937)). "Indeed, post-*MedImmune*, it is clear that a declaratory judgment plaintiff does not need to establish a reasonable apprehension of a lawsuit in order to establish that there is an actual controversy between the parties." *Geisha, LLC v. Tuccillo*, 525 F. Supp. 2d 1002, 1012 (N.D. Ill. 2007) (quoting *Sony Elecs., Inc. v. Guardian Media Techs., Ltd.*, 497 F.3d 1271, 1283-84 (Fed. Cir. 2007)) (internal quotation marks omitted).

Recognizing that the DJA confers on federal courts "unique and substantial discretion in deciding whether to declare the rights of litigants," *MedImmune*, 549 U.S. at 136 (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)), the Court follows *MedImmune*'s guidance in determining whether exercising federal jurisdiction is proper in this case. First, a substantial controversy exists between Klinger and Conan Doyle pertaining to Klinger's legal rights to create new derivative works based on the Sherlock Holmes Story Elements. Next, the parties have clear, adverse legal interests as Klinger seeks to use the Sherlock Holmes Story Elements, and Conan Doyle seeks to exert its exclusive copyright over the Elements. Determining the copyright status of the Sherlock Holmes Story Elements is a real and immediate concern to Klinger, as his ability to publish *In the Company of Sherlock Holmes* with Pegasus Books hinges on the issuance of this declaratory judgment. (Klinger's Facts ¶ 21.) Klinger is constrained from engaging in "extra-judicial conduct (that the law does not aim to discourage) so long as its . . .

8

rights are unclear." *Hyatt Int'l. Corp. v. Coco*, 302 F.3d 707, 712 (7th Cir. 2002); *see also Sears, Roebuck & Co. v. Am. Mut. Liab. Ins. Co.*, 372 F.2d 435, 438 (7th Cir. 1967) ("the purpose of the Act [is] to afford relief from uncertainty and insecurity with respect to legal relations"). Accordingly, the Court is satisfied that this case presents an actual case or controversy as required by the DJA.

Conan Doyle argues that even if an "actual controversy" exists, the Court should decline to exercise jurisdiction over the case for prudential reasons. (R. 28, Conan Doyle's Reply at 14-15.) Specifically, it argues that this case is actually about whether Klinger's new anthology infringes upon Conan Doyle's copyright. (*Id.* at 15.) Therefore, it contends that because Klinger did not offer *In the Company of Sherlock Holmes* to the Court to determine if it infringes upon Conan Doyle's copyright, the Court cannot resolve the entire conflict in this action. (*Id.*) Klinger counters that he is asking the Court to clarify the copyright status of the Sherlock Holmes Story Elements so that he, along with the public, may use the Elements without being subject to Conan Doyle's licensing demands. (R. 30, Klinger's Reply at 14.)

Conan Doyle is correct that a "[d]eclaratory judgment should not be granted to try particular issues without settling the entire controversy." *Sears, Roebuck & Co.*, 372 F.2d at 438. Klinger has clarified that he seeks a determination only as to the copyright status of the Sherlock Holmes Story Elements, not *In the Company of Sherlock Holmes*. (R. 1, Compl. at 16; R. 14, Klinger's Mem. at 4.) Klinger alleges that *In the Company of Sherlock Holmes* only employs the Sherlock Holmes Story Elements and does not utilize other story elements from the Ten Stories. (R. 1, Compl. ¶¶ 25, 30.) In fact, Klinger states that he instructed Dirda to seek a license from Conan Doyle for the use of any character or story elements that are still under copyright protection. (R. 29-1, Klinger's Suppl. Decl. ¶ 9.) Therefore, once the Court clarifies

the copyright status of the Sherlock Holmes Story Elements, the outcome of this action should

prevent any future litigation between Klinger and Conan Doyle as to the Sherlock Holmes Story

Elements. *See Sears, Roebuck & Co.*, 372 F.2d at 438 ("The standards generally to be applied in

exercising discretion to hear a declaratory judgment action are whether a declaratory judgment

will settle the particular controversy and clarify the legal relations in issue.") Consequently, the

Court will exercise its jurisdiction over the case.

## II.    Pre-1923 Sherlock Holmes Story Elements[4]

Klinger seeks a judicial determination that the Sherlock Holmes Story Elements are free

for public use because the stories in which the elements were first introduced have entered the

public domain. (R. 14, Klinger's Mem. at 4.) Conan Doyle, on the other hand, argues that

because Sherlock Holmes and Dr. Watson were continually developed throughout the entire

Canon, the copyright protecting the Ten Stories should extend to the Sherlock Holmes and Dr.

Watson characters and the story elements pertaining to those characters. (R. 28, Conan Doyle's

Mem. at 6.) The Court must first determine which elements were first introduced in public

domain stories ("Pre-1923 Story Elements") and which were introduced in the copyrighted Ten

---

[4]  In his complaint, Klinger alleges that the Ten Stories listed in Exhibit B and the Sherlock
Holmes Story Elements contained in Exhibit A are in the public domain and thus available for
public use. (R. 1, Compl. ¶ 40.) Klinger fails, however, to offer any argument regarding the
copyright status of the Ten Stories in his motion for summary judgment or subsequent pleadings.
The Ten Stories are plainly still subject to copyright protection, a fact that Klinger acknowledges
in Exhibit B, where he states that the Ten Stories "have not yet entered the public domain in the
United States of America." (R. 1-2, Ex. B, Ten Stories.) Klinger has thus abandoned the
argument that the Ten Stories are in the public domain. *See Palmer v. Marion Cnty.*, 327 F.3d
588, 597-98 (7th Cir. 2003) (deeming the plaintiff's negligence claim abandoned because he
failed to delineate it in his brief in opposition to summary judgment); *Oak Brook Hotel Co. v.
Teachers Ins. & Annuity Ass'n of Am.*, 846 F. Supp. 634, 641 (N.D. Ill. 1994) (finding the
plaintiff's failure to defend a particular claim in response to the defendant's motion for summary
judgment constituted abandonment of the claim). Accordingly, the Court will only address the
copyright status of the Sherlock Holmes Story Elements. (R. 1-1, Ex. A, Sherlock Holmes Story
Elements.)

Stories ("Post-1923 Story Elements"). Klinger and the public may use the Pre-1923 Story Elements without seeking a license. *See Silverman v. CBS, Inc.*, 870 F.2d 40, 50 (2d Cir. 1989) (holding that where some radio scripts from a radio show had entered the public domain and others were protected by copyright, plaintiff was entitled to use the public domain material without a license). The Court subsequently must examine the Post-1923 Story Elements to determine if they constitute "increments of expression," and are thereby protected from unauthorized use by the Conan Doyle's copyright in the Ten Stories, or if they belong to the class of story elements, such as events, plots and ideas, which are not copyrightable. *See id.* (holding that the copyrighted radio scripts only protected the "increments of expression" beyond what was contained in the public domain radio scripts).

Klinger first argues that the Sherlock Holmes Story Elements originated in works that have entered the public domain, and are thus free to any member of the public to use. (R. 14, Klinger's Mem. at 6.) Conan Doyle does not dispute that the works that comprise the Canon, with the exception of the Ten Stories, are in the public domain. (R. 28, Conan Doyle's Mem. at 1.) Further, it does not directly discuss the copyright status of the Pre-1923 Story Elements. Instead, Conan Doyle proffers a novel legal argument that the characters of Sherlock Holmes and Dr. Watson continued to be developed throughout the copyrighted Ten Stories and therefore remain under copyright protection until the final copyrighted story enters the public domain in 2022.[5] (*Id.* at 3-8.) Conan Doyle argues that because the Sherlock Holmes Story Elements

---

[5] It appears that Conan Doyle believes the copyrights of the Ten Stories expires in 2022 (R. 18, Conan Doyle Mem. at 1), while Klinger asserts that the copyrights expires in 2023 (R. 1-2, Ex. B, Ten Stories). For the purposes of this declaratory judgment determination, it is only necessary to determine that the Ten Stories are still under valid copyrights, a fact to which both parties stipulate. (Conan Doyle's 56.1 Resp. ¶ 15.)

include character attributes that are under copyright protection, the Court cannot find that the Elements are in the public domain. (*Id.* at 4-5.)

Where an author has used the same character in a series of works, some of which are in the public domain, the public is free to copy story elements from the public domain works. *See* 1 *Nimmer on Copyright* § 2.12 (citing *Nat'l Comics Publishers, Inc. v. Fawcett Publ'ns, Inc.*, 191 F.2d 594 (2d Cir. 1951)) ("Clearly anyone may copy such elements as have entered the public domain, and no one may copy such elements as remain protected by copyright.") The Second Circuit's landmark case *Silverman v. CBS, Inc.* decided the copyright status of the radio scripts that created the "Amos 'n' Andy" characters from the eponymous radio broadcast and subsequent television program. The characters were created for radio in 1928, and the radio broadcast became one of the country's most popular programs. *Silverman*, 870 F.2d at 42. In 1948, the creators assigned their rights in the scripts that were already written (the "pre-1948 radio scripts") to CBS. *Id.* The radio programs continued until 1955. *Id.* In 1951, CBS also began broadcasting an "Amos 'n' Andy" television series that aired on CBS affiliate stations until 1953 and continued in syndication until 1966. *Id.* In 1981, Silverman began writing a script for a Broadway musical based on the "Amos 'n' Andy" characters, but CBS refused to grant Silverman a license to use the characters. *Id.* at 43, 50. The pre-1948 radio scripts had entered the public domain because the copyrights had not been renewed by the original creators of "Amos 'n' Andy." *Id.* at 43. Silverman filed a lawsuit seeking a declaration that the "Amos 'n' Andy" radio scripts were in the public domain, and thus he was free to make use of the characters, plots, and other content contained in the scripts. *Id.* The Second Circuit held that Silverman was free to use material from the pre-1948 radio scripts. *Id.* at 50. It further held that the "Amos 'n' Andy" characters had been sufficiently delineated in the pre-1948 radio scripts

such that they entered the public domain along with the pre-1948 radio scripts. *Id.* The Second

Circuit found, however, that the "increments of expression" contained in the post-1948 radio

scripts and television scripts that further delineated the characters and story were protected by

CBS's copyright. *Id.* Therefore, Silverman would only infringe upon CBS's copyright if he

copied the character and story elements that were introduced in the post-1948 radio and

television scripts. *Id.*

Applying the rationale articulated in *Silverman* to Sir Arthur Conan Doyle's Canon, the

district court in *Pannonia Farms, Inc. v. USA Cable*,[6] No. 03 CIV. 7841, 2004 WL 1276842

(S.D.N.Y. June 8, 2004), found that *only* the "increments of expression" added by the Ten

Stories were protected by copyright. *Id.*, at *9. The district court clarified that "[s]torylines,

dialogue, characters and character traits newly introduced by the [Ten Stories] are examples of

added contributions susceptible to copyright protection." *Id.* It is a bedrock principle of

copyright that "once work enters the public domain it cannot be appropriated as private

(intellectual) property," and even the most creative of legal theories cannot trump this tenet.

*Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 361 F.3d 434, 436 (7th Cir. 2004). Having

established that all but the Ten Stories have passed into the public domain, this Court concludes

that the Pre-1923 Story Elements are free for public use.

Conan Doyle argues that the effect of such a holding will be to dismantle Sir Arthur

Conan Doyle's characters into a public domain version and a copyrighted version. (R. 28, Conan

Doyle's Mem. at 7.) This is, however, precisely what prior courts have done. *Silverman* and

*Pannonia Farms* instruct that characters and story elements first articulated in public domain

---

[6] The Court notes that neither the Conan Doyle Estate nor Klinger were parties to *Pannonia Farms*. Nonetheless, the Court finds the *Pannonia Farms* holding persuasive because of its factual similarity and cogent analysis of the case law.

works are free for public use, while the further delineation of the characters and story elements in protected works retain their protected status. *Silverman*, 870 F. 2d at 50; *Pannonia Farms*, 2004 WL 1276842, at *9. Conan Doyle argues that the precedent exemplified in *Silverman* should pertain only to two-dimensional, "flat" characters and not to complex, three-dimensional characters such as Sherlock Holmes and Dr. Watson. (R. 28, Conan Doyle's Mem. at 8-10.) Conan Doyle fails to offer a bright line rule or workable legal standard for determining when characters are sufficiently developed to warrant copyright protection through an entire series, nor does it provide any case law that supports its position. Conan Doyle's proposed distinction runs counter to prevailing case law. *See Siegel v. Warner Bros. Entm't Inc.*, 690 F. Supp. 2d 1048, 1058-59 (C.D. Cal. 2009) ("[T]he copyrightable aspects of a character . . . are protected only to the extent the work in which that particular aspect of the character was first delineated remains protected."); *see also Gaiman v. McFarlane*, 360 F.3d 644, 660 (7th Cir. 2004) (holding that once a comic book character was drawn, named, and given speech, it was sufficiently distinctive to be copyrightable). The effect of adopting Conan Doyle's position would be to extend impermissibly the copyright of certain character elements of Holmes and Watson beyond their statutory period, contrary to the goals of the Copyright Act. *See id.* at 661 (citing *Lee v. A.R.T. Co.*, 125 F.3d 580, 581–83 (7th Cir. 1997)); *see also Stewart v. Abend*, 495 U.S. 207, 228 (1990) ("The copyright term is limited so that the public will not be permanently deprived of the fruits of an artist's labors."). Accordingly, the Pre-1923 Story Elements are free for public use.

Conan Doyle and Klinger agree that a portion of the Sherlock Holmes Story Elements originated in post-1923 works, so the Court must now determine whether those elements are protected by copyright.

14

### III.    Post-1923 Sherlock Holmes Story Elements

By Klinger's own admission, the Sherlock Holmes Story Elements include elements first introduced in the copyrighted Ten Stories (the "Post-1923 Story Elements"). (R. 1-1, Ex. A, Sherlock Holmes Story Elements.) The Post-1923 Story Elements pertain to the characters Dr. Watson and Sherlock Holmes and include: (1) Dr. Watson's second wife, first described in the 1924 short story "The Illustrious Client"; (2) Dr. Watson's background as an athlete, first described in the 1924 short story "The Sussex Vampire"; (3) and Sherlock Holmes' retirement from his detective agency, first described in the 1926 short story "The Lion's Mane."[7] (*Id.*) Conan Doyle argues that these elements are protected by copyright and their inclusion in Klinger's Sherlock Holmes Story Elements requires the Court to find that the Elements are not in the public domain. (R. 28, Conan Doyle's Mem. at 13.) Klinger contends that the Post-1923 Story Elements are events rather than characteristics of Dr. Watson and Sherlock Holmes and, as such, are not copyrightable. (Klinger's Rule 56.1 Resp. ¶ 6.) Klinger argues that any material first introduced in the Ten Stories does not complete the characters of Sherlock Holmes or Dr. Watson and therefore does not qualify for copyright protection. (R. 29-1, Klinger's Suppl. Decl. ¶ 3.) Courts do not distinguish between elements that "complete" a character and elements that do not; instead, the case law instructs that the "increments of expression" contained in copyrighted works warrant copyright protection. *See Silverman*, 870 F.2d at 50.

---

[7] In Conan Doyle's Rule 56.1 Statement of Additional Facts, it claims that Sherlock Holmes' retirement was introduced in the 1926 short story "The Lion's Mane," which is currently protected by copyright. (Conan Doyle's Facts ¶ 6(i).) Klinger did not dispute this fact. In Klinger's Sherlock Holmes Story Elements, however, he alleges that Sherlock Holmes' retirement was introduced in the 1917 short story "His Last Bow," which has entered the public domain. (R. 1-1, Ex. A, Sherlock Holmes Story Elements.) As discussed above, on a motion for summary judgment, the Court limits its analysis of the facts to the parties Local Rule 56.1 Statements. *See Bordelon*, 233 F.3d at 529. Because Klinger did not deny this factual statement, it is deemed admitted. Therefore, the Court will consider Sherlock Holmes' retirement as a Post-1923 Story Element.

The "increments of expression" test originates from the Copyright Act's discussion of the copyrightability of derivative works. *See Schrock v. Learning Curve Int'l. Inc.*, 586 F.3d 513, 518 (7th Cir. 2009) ("The Copyright Act specifically grants the author of a derivative work copyright protection in the incremental original expression he contributes as long as the derivative work does not infringe the underlying work."); *see also* 17 U.S.C. § 103(b) ("The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material.") In *Schrock v. Learning Curve International Inc.*, the Seventh Circuit stated that "the only originality required for a new work to be copyrightable is enough expressive variation from public-domain or other existing works to enable the new work to be readily distinguished from its predecessors." 586 F.3d at 521 (quoting *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 929 (7th Cir. 2003) (internal alterations and quotation marks omitted).

Thus far the cases in this Circuit have only applied the incremental expression test to derivative works. *See, e.g., Schrock*, 586 F.3d 513; *Pickett v. Prince*, 207 F.3d 402 (7th Cir. 2000); *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191 (7th Cir. 1987). Conan Doyle argues that Sir Arthur Conan Doyle developed his characters throughout the entire Canon, and therefore no single work in the Canon is a derivative of another work. (R. 28, Conan Doyle's Mem. at 12.) A derivative work is defined as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. Professor Nimmer opines that after a character has been introduced in a work, subsequent works in a series

that feature the same character are derivative works. *See* 1 *Nimmer on Copyright* § 2.12. To support his proposition, Professor Nimmer cites to case law that adopts the position that sequels or series featuring the same character are derivative works. *Id.* § 2.12 n.23 (citing *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1112 (9th Cir. 1998) (user-created files based on copyrighted Duke Nukem computer game "are surely sequels, telling new . . . tales of Duke's fabulous adventures. A book about Duke would infringe for the same reason, even if it contained no pictures.")); § 2.12 n.23.1 (citing *Salinger v. Colting*, 641 F. Supp. 2d 250, 267 (S.D.N.Y. 2009) (holding that a novel that continues the story of *Catcher in the Rye* and its protagonist constitutes a derivative work), *vacated on other grounds*, 607 F.3d 68 (2d Cir. 2010)). In *Silverman*, the Second Circuit assumed without explicitly holding that the post-1948 scripts featuring the characters "Amos 'n' Andy" were derivative works in applying the incremental expressions test. *See Silverman*, 870 F.2d at 49 ("[C]opyrights in derivative works secure protection only for the incremental additions of originality contributed by the authors of the derivative works.") (citing 1 *Nimmer on Copyright* §§ 2.01, 3.04 (1988)). The *Pannonia Farms* court did not reach the issue as it pertains to the Canon, but nevertheless adopted the increments of expression test. 2004 WL 1276842, at *9 (holding that the increments of expression added by the Ten Stories to Sherlock Holmes, Dr. Watson, or any aspect of Sir Arthur Conan Doyle's pre-1923 stories are protected).

The Seventh Circuit has been silent on the issue of whether literary sequels or series constitute derivative works. In *Schrock*, the Seventh Circuit assumed without deciding that photographs of copyrighted materials were derivative works and consequently applied the increments of expression test to determine whether the photographs qualified for copyright protection. 586 F.3d at 518-19. Although the facts of *Schrock* do not arise in the context of literary works, the Court finds the principles enunciated in the holding to be instructive in the

17

instant case. In this case, similar to *Schrock*, the Canon consists of subsequent works that are based upon material from a pre-existing work, Sir Arthur Conan Doyle's first Sherlock Holmes story. The subsequent works in the Canon, including the Ten Stories, thereby meet the definition of derivative works. Therefore, the Court will assume for the purposes of this analysis, as the *Silverman* court did, that the Ten Stories are derivative works of Sir Arthur Conan Doyle's first Sherlock Holmes story. Accordingly, the Court will apply the increments of expression test to the Post-1923 Story Elements.

In *Pannonia Farms*, the district court defined increments of expression to include "[s]torylines, dialogue, characters and character traits newly introduced in the [Ten Stories]." 2004 WL 1276842, at *9. The Post-1923 Story Elements, Dr. Watson's second wife and his athletic background, as well as Sherlock Holmes' retirement, are a character, character trait, and a storyline, respectively. These elements originated in the copyrighted Ten Stories. (R. 1-1, Ex. A, Sherlock Holmes Story Elements.) On the record before the Court, there is substantial evidence that the Post-1923 Story Elements constitute "original expression" beyond what is contained in the public domain portion of the Canon. *Silverman*, 870 F.2d at 50. (*See* Conan Doyle's Facts ¶ 6(i)-(k); R. 27-1, Lellenberg Aff. ¶ 11; R. 27-2, Estlenman Aff. ¶ 14; R. 27-3, Fletcher Aff. ¶ 10.) The Court notes here that neither party has submitted any portion of the Canon for review by the Court, and at the summary judgment stage, the Court must make all reasonable inferences against the movant. Because the Seventh Circuit's incremental expression case law focuses on images rather than literature, it is difficult to apply its precedent seamlessly, but the Court finds that the low threshold of originality required for increments of expression counsels toward finding the Post-1923 Story Elements are copyrightable. *See Schrock*, 586 F.3d at 521 (quoting *Bucklew*, 329 F.3d at 929) ("the only originality required for a new work to be

copyrightable is enough expressive variation from public-domain or other existing works to enable the new work to be readily distinguished from its predecessors"). As a result, the Court finds that the Post-1923 Story Elements meet the increments of expression test as articulated in *Silverman* and *Pannonia Farms*.

Seeking to avoid this result, Klinger contends that the Post-1923 Story Elements are not susceptible to copyright protection because they are events, not characteristics. (Klinger's Rule 56.1 Resp. ¶ 6.) "Copyright protection does not extend to ideas, plots, dramatic situations and events." *Scott v. WKJG, Inc.*, 376 F.2d 467, 469 (7th Cir. 1967). The Post-1923 Story Elements, however, do not fit into any of the categories articulated by *Scott* and instead, as previously established, consist of a character, character trait, and storyline, which are copyrightable increments of expression. *See Pannonia Farms*, 2004 WL 1276842 at, *9. Klinger has failed to provide any evidence that the Post-1923 Story Elements are not susceptible to copyright protection, and the Court finds that the Post-1923 Story Elements are protected.

Klinger's motion for summary judgment rests on the following two propositions: (1) the Pre-1923 Story Elements are in the public domain and are thus available for public use, (R. 14, Klinger's Mem. at 5); and (2) the Post-1923 Story Elements are events that are not essential to the story or characters of Sherlock Holmes and Dr. Watson and therefore do not constitute incremental expression susceptible to copyright, (Klinger's Rule 56.1 Resp. ¶ 6). As the moving party on a motion for summary judgment, Klinger carries the initial burden of "establishing that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Even when no issue of material fact is present, the district court must make the further finding that given the undisputed facts, summary judgment is proper as a matter of law. *Wienco, Inc. v. Katahn Associates, Inc.* 965 F.2d 565, 568 (7th Cir. 1992) (citing

*Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir. 1989) (stating that in a summary

judgment case "the district court must decide whether the movant has a good legal position")).

Klinger has met his burden as to his first proposition, but has failed as to his second

proposition. Neither party has presented a genuine issue of material of fact.[8]  The law is clear

that Klinger is entitled to use the Pre-1923 Story Elements.  The evidence presented to the Court

as to this first proposition is "so one-sided" that Klinger must prevail as a matter of law.

*Anderson*, 477 U.S. at 251-52. As to his second proposition, however, Klinger's argument that

he is entitled to judgment as a matter of law is unavailing and overcome by the relevant case law.

The Post-1923 Story Elements are protected under copyright, and as a result neither Klinger nor

the public are entitled to use them.  Accordingly, the Court grants Klinger's motion as to the Pre-

1923 Story Elements and denies it as to the Post-1923 Story Elements .[9]

## IV.     Injunctive Relief

In addition to a declaratory judgment, Klinger seeks to enjoin Conan Doyle from further

asserting its right under copyright law over the complete list of Sherlock Holmes Story Elements.

(R. 1, Compl. at 16.) Injunctive relief is "an extraordinary remedy that may only be awarded

upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def.*

*Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)

(*per curiam*)).  In deciding whether to grant preliminary injunctive relief, a court must consider

four traditional criteria:

---

[8]   Conan Doyle argues that the copyright status of the Sherlock Holmes character is a question
of fact.  (R. 28, Conan Doyle's Mem. at 7.)  The Court, however, has already clarified that
Klinger does not seek a judicial determination of the copyright status of the Sherlock Holmes
character, however, and thus the Court does not address this issue.
[9]   Conan Doyle requested an oral argument in this case.  The Court has decided for the reasons
set forth in this opinion that an oral argument is unnecessary.

(1) whether the plaintiff has a reasonable likelihood of success on the merits; (2) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; (3) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; and (4) whether the granting of the injunction will harm the public interest.

*Plummer v. Am. Inst. of Certified Pub. Accountants*, 97 F.3d 220, 229 (7th Cir. 1996). A

preliminary injunction is provisional in nature, but a permanent injunction is a final judgment.

*Id.* (citing *Walgreen Co. v. Sara Creek Prop. Co.*, 966 F.2d 273, 275 (7th Cir. 1992)). Klinger

does not distinguish which type of injunction he seeks. Based on the complaint, however, it does

not appear that Klinger is seeking a provisional order, but rather a permanent one. (*See* R. 1,

Compl. at 16) ("[Klinger seeks] an Order enjoining Defendant and its agents and attorneys from

further asserting rights under copyright in . . . the Sherlock Holmes Story Elements . . . and from

interfering with the exploitation of the Sherlock Holmes Story Elements by Plaintiff. ").

Therefore, the Court will consider whether a permanent injunction is appropriate in this case.

When the plaintiff is seeking a permanent injunction, the first of the four factors is

slightly modified, as the issue is not whether the plaintiff has demonstrated a reasonable

likelihood of success on the merits, but whether he has in fact succeeded on the merits. *See*

*Chathas v. Local 134 Int'l Bhd. of Elec. Workers*, 233 F.3d 508, 513 (7th Cir. 2000) ("the

predicate for a permanent injunction would have to be that they had prevailed on the merits . . . A

plaintiff cannot obtain a permanent injunction merely on a showing that he is likely to win when

and if the merits are adjudicated.") Here, although the Court has determined that Klinger is

entitled to use the Pre-1923 Story Elements, Klinger requests an injunction barring Conan Doyle

from asserting its copyright as to any of the Sherlock Holmes Story Elements. This request is

broader than the relief Klinger is entitled to, and therefore, the Court must deny Klinger's request

for injunctive relief.

## CONCLUSION

For the foregoing reasons, Klinger's motion for summary judgment (R. 11) is GRANTED in part and DENIED in part. It is granted with respect to Klinger's use of the Pre-1923 Story Elements and denied with respect to Klinger's use of the Post-1923 Story Elements. The Clerk of the Court is directed to enter a declaratory judgment in favor of Klinger only to the extent stated in this opinion.

ENTERED: 

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: December 23, 2013**